531 A.2d 683

**RANDOM HOUSE, INC.**

v.

**COMPTROLLER OF THE TREASURY.**

No. 9, Sept. Term, 1987.

Court of Appeals of Maryland.

Oct. 8, 1987.

E. Stephen Derby (Karen L. Myers Zauner and Piper & Marbury, on the brief), Baltimore, for appellant.

John K. Barry, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Gerald Langbaum, Asst. Atty. Gen., on the brief), Annapolis, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH *, McAULIFFE and ADKINS, JJ.

RODOWSKY, Judge.

For taxing the income of corporations carrying on a unitary business in this state and elsewhere, Maryland Code (1957, 1980 Repl. Vol., 1986 Cum.Supp.), Art. 81, § 316 requires that net income be apportioned to this state on the basis of a formula using property, payroll, and sales.[1]

---

\* COUCH, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. 31, Sec. 3A, he also participated in the decision and adoption of this opinion.

1. For the years involved in the instant appeal the applicable statute, then § 316(c), read:

 (c) *Business Income.*—The remaining net income, hereinafter referred to as business income, shall be allocated to this State if the

Applying that formula the Comptroller of the Treasury assessed Random House, Inc. The taxpayer argues that the Comptroller should modify the monetary amounts utilized in the formula because the Comptroller has increased the income to be apportioned, over that reported, by including income from a type of intangible property known as subsidiary rights. We shall uphold the assessment as made by the Comptroller.

Random House is a New York corporation whose principal business office is in that state. As a book publisher, it contracts with authors to acquire their works for publication. Random House edits an author's manuscript, designs the book and cover, subcontracts the printing and binding, has the printed volumes shipped to its warehouse in Westminster, Maryland, sells the book from orders which are solicited by salesmen throughout the United States and which are accepted by Random House in New York, distributes volumes of the book from its Maryland warehouse to

trade or business of the corporation is carried on wholly within this State, but if the trade or business of the corporation is carried on partly within and partly without this State so much of the business income of the corporation as is derived from or reasonably attributable to the trade or business of the corporation carried on within this State, shall be allocated to this State and any balance of the business income shall be allocated outside this State. The portion of the business income derived from or reasonably attributable to the trade or business carried on within this State may be determined by a separate accounting where practicable, but never in the case of a unitary business; however, where separate accounting is neither allowable nor practicable the portion of the business income of the corporation allowable to this State shall be determined in accordance with a three-factor formula of property, payroll and sales, in which each factor shall be given equal weight and in which the property factor shall include rented as well as owned property and tangible personal property having a permanent situs within this State and used in the trade or business shall be included as well as real property. The Comptroller of the Treasury shall have the right, in those cases where circumstances warrant, to alter any of the above rules as to the use of the separate accounting method or the formula method, the weight to be given the various factors in the formula, the manner of valuation of rented property included in the property factor and the determination of the extent to which tangible personal property is permanently located within the State.

purchasers, and invoices and collects from Maryland the price of the volumes sold.

In general the contract to publish grants to the publisher certain rights, for a specified territory and period of time, in the author's work. For purposes of simplicity we shall consider that the primary rights are to print the work in the English language in hardcover book form and to sell it throughout the United States. In addition, the contract to publish ordinarily will specify other rights, subsidiary rights, which are granted to the publisher and not reserved by the author.

Among the vast number of recognized subsidiary rights are: first and second serial (magazine rights), newspaper syndication, dramatization, motion picture (exclusive of such visuals as microfilm, microprint, and filmstrip), and broadcasting (radio and television); reprints, special school or library editions, book clubs (including school and mail order), abridgments, condensations, digests, selections, anthologies, translations, and commercial tie-ins; picturized, three-dimensional, and game versions; visuals (such as microfilm, microprint, and filmstrip), lyric, sound-reproducing, and recording rights; the right to sell copies by mail order or coupon advertising direct to purchasers; the right to sell bound copies or sets of sheets to book clubs, or to purchasers abroad; and so forth. [W. Derenberg & A. Latman, *Contemporary Problems in Book Publishing, Magazine Publishing and Advertising,* at 36 (Practicing Law Institute 1970).[2]]

Although the present assessments concern four accounting periods in calendar years 1979 through 1981, the issue before us originated in an earlier case when Random House omitted subsidiary rights income from its Maryland returns for 1977 and 1978. The taxpayer's theory was that its income from subsidiary rights in a given work was derived

---

2. A Random House exhibit before the Maryland Tax Court further simplified the subsidiary rights concept by referring only to foreign and paperback editions and to serial rights.

from a business separate from publishing the hardback edition of that work and that, since this separate business was not conducted in Maryland, no income earned from those rights should be allocated to Maryland. In *Xerox Corp. v. Comptroller*, 290 Md. 126, 428 A.2d 1208 (1981), we had held that § 316(c) included business income from intangible property of a unitary business to the extent constitutionally permissible. The Maryland Tax Court, ruling in 1984 on the assessments for 1977 and 1978, held that the sale or licensing of subsidiary rights was part of Random House's unitary business so that subsidiary rights income was apportionable to Maryland. The Tax Court went on to hold that Random House had

> not shown that a gross distortion has occurred through the Comptroller's application of the standard apportionment formula. Furthermore, [Random House] has failed to suggest a feasible method for valuation of its subsidiary rights. Counsel for Petitioner mentioned "present discounted value with the capitalization type approach" at the hearing, but added that that would be "something that would have to be studied to come up with a value." ... Hence, there is no way to compare the effect of using an apportionment formula which includes a value for underlying subsidiary rights to the formula in fact used by the Comptroller because no value for the rights is readily determinable. Thus there is no proof that the result reached by the Comptroller was grossly distorted.

In the instant case Random House undertook to fill the evidentiary vacuum. After the Comptroller had assessed Random House for 1979 through 1981 in order to include subsidiary rights income in the apportionable basis, Random House appealed and presented twenty-six pages of data and calculations, with explanatory testimony, to the Tax Court. That agency again held that Random House failed to prove that the apportionment made by the Comptroller grossly distorted the taxpayer's Maryland income. The Circuit Court for Baltimore City affirmed and we granted certiorari

prior to consideration of the taxpayer's appeal by the Court of Special Appeals.

Random House does not take issue here with the Tax Court's finding that producing income from subsidiary rights is part of a unitary business conducted by Random House in Maryland and elsewhere. The attack is limited to the way in which the Comptroller applied the three-factor formula. Random House had neither included subsidiary rights income in the apportionable basis reported in its Maryland returns nor included subsidiary rights and the income therefrom in the property and sales factors of the statutory formula. In making its assessment the Comptroller's office added into the apportionable basis Random House's subsidiary rights income and then applied to the increased basis the Maryland apportionment percentage developed by Random House for use in its return. Random House contends that the Comptroller thereby substantially distorted its Maryland income. It submits that if subsidiary rights income is to be included in the apportionable basis, then both the sales factor and, more important, the property factor must be adjusted to reflect subsidiary rights.

The formula used by the Comptroller was

$$\frac{1}{3}\left(\frac{\text{Md. tangible property}}{\text{All tangible property}}\right) + \frac{\text{Md. payroll}}{\text{All payroll}} + \left(\frac{\text{Md. sales}}{\text{All sales}}\right) = \text{Md. \% of apportionable basis.}$$

The fact that Random House stores its inventory and maintains its billing center in Maryland is commensurately reflected in the property factor used in the assessment. In order to add intangible property to that factor a value must be placed on subsidiary rights. The taxpayer submits that, in corporate acquisitions in the publishing business, subsidiary rights are valued based on the income stream to be produced by works over their useful lives and that the Comptroller was required to undertake the same sort of valuation.

Maryland Regs. Code tit. 3, § .04.01.03C(3) (1987) in part provides that, in applying the statutory formula, "[p]roperty owned by the taxpayer is valued at its original cost." Random House does not carry subsidiary rights at all on its balance sheet and in its proof before the Tax Court the taxpayer did not present the total cost of subsidiary rights in the approximately 25,000 literary works to which it holds publication rights. It did, however, present as the income to be used for valuing subsidiary rights its internal computation of the pretax profits of each of its five operating divisions.[3] These profits were derived from both "hardback" sales and subsidiary rights sales and licensing.

Another difficulty faced by the taxpayer in using the pretax profits of intracorporate divisions to prove the value of subsidiary rights is that the sales life of a work can extend beyond the year in which rights, including subsidiary rights, were acquired by the publisher. Attempting to clear this hurdle the taxpayer assumes that earnings from subsidiary rights in a work will first be reflected in divisional pretax profits in the year in which the subsidiary rights are acquired, and that the total net profit in a division for one year may be converted into a figure representing the value of that year's subsidiary rights for works acquired that year, as well as for each year thereafter in which those rights produce income. Random House spreads forward in time a portion of a division's net profit for a particular year on the basis of the assumed average sales life of all divisional works. For example, Random House's methodology assumes that 70% of the sales from each adult division work will be produced in the first year of publication and that the remaining 30% of sales will occur the following year. Taxpayer then reduces the future portion of the profit to present value utilizing a prime rate as the rate of return in order to reflect the value of divisional

---

**3.** There are separate divisions in Random House for adult works, for juvenile works, for elementary and high school texts, for college texts, and for works published directly in paperback form.

subsidiary rights in the year for which the pretax profits were earned. The discounted net profits for each division for each year are totaled to produce what Random House presents as the value of corporate subsidiary rights for that year.

This methodology may be illustrated using the dollars involved in the adult division example referred to above. The pretax net profit of the adult division for 1979 was $4,456,000. To value subsidiary rights, Random House treats only 70% of that amount as having been earned in 1979, that is, $3,119,000. It treats 30% of the 1979 pretax profits, $1,337,000, as if there were a one-year delay in receipt and discounts that $1,337,000 to $1,324,000, producing a discounted value of total 1979 pretax, adult division profits of $4,270,000. The taxpayer assumes, in the example, that the discounted value of 30% of the 1979 pretax profits of the adult division represents the assumed 30% tail on sales of adult division works for which subsidiary rights were acquired in 1978.[4]

The initial step of the methodology fails to segregate the pretax profits produced by subsidiary rights from the pretax profits produced by all other unitary business sources. Thus Random House has not valued subsidiary rights *per se*, but has valued all rights which it has acquired in works currently in print. Seemingly, by using unsegregated net profits, the methodology values publication rights which have already been represented in the property factor denominator by the cost of the tangible volumes of literary works published directly by Random House and held by it in inventory at the Maryland warehouse.

---

**4.** Using the same example, it may have been more consistent with Random House's theory to have added to 70% of the 1979 pretax profits the discounted value of 30% of the pretax profits earned in 1980 and to have attributed the discounted value of 30% of the 1979 pretax profits to 1978. But, because the taxpayer cannot postpone filing a return for one year until the pretax profit figures for the next succeeding year or years are determined, the proposed valuation method necessarily attempts to work with the figures for the year being reported in a return.

With respect to the sales or revenue factor of the formula, the taxpayer was able to present from its accounting system the *gross* income received from subsidiary rights in the accounting periods involved here (the "addback royalty income").

Armed with its "valuation of subsidiary rights" and the addback royalty income, the taxpayer presented four variations on the formula, labeled "A" through "D" respectively, to the Tax Court. In each presentation the payroll factor numbers are those utilized in the returns as filed and in the assessment. In each variation the denominator of the sales factor, representing revenues everywhere, uses Random House sales as reported on the return plus the addback royalty income. In each variation the denominator of the property factor, representing property everywhere, is the amount reported on the return plus the taxpayer's "valuation of subsidiary rights." The differences between "A," "B," "C," and "D" lie in the numerators employed in the sales and property factors which reflect different apportionments to Maryland.

In variation "A" Random House adds to Maryland sales as reported on its return that percentage of addback royalty income which is the ratio of reported sales in Maryland to sales everywhere. In "A's" property factor Random House adds to the value of Maryland tangible property that percentage of its "valuation of subsidiary rights" which is the ratio of Maryland tangible property to tangible property everywhere. In "B" the numerators of the sales and property factors, as reported, are increased by applying Maryland's percentage of the national population to the addback royalty income and to the "valuation of subsidiary rights."

Variation "C" apportions none of the addback royalty income to Maryland in the sales numerator and "C's" property numerator utilizes a population ratio allocation. Similarly "D" makes no apportionment to Maryland of addback royalty income and, in addition, apportions nothing to Maryland for intangible property. In its argument to the Tax Court Random House favored method "D" and in essence

argued that all of the addback royalty income and all of its "valuation of subsidiary rights" should be allocated to New York because New York is almost always the place of formation of the contracts to publish under which Random House acquires subsidiary rights and because New York is most often the place of formation of the contracts to sell or license subsidiary rights.

For the four accounting periods involved here, the aggregate of the income apportioned to Maryland under the Comptroller's assessment exceeds that proposed by Random House by 8.24% as to "A," by 8.98% as to "B," by 9.18% as to "C," and by 9.72% as to "D."

Obviously the Tax Court was not required to accept any of the methods proposed by Random House for computing the assessment. Section 316 provides that the Comptroller has the right to alter the formula method used; in this case he chose not to exercise his discretion in this manner. Further, our review of the methods submitted by Random House for determining the numerical values to be inserted into the statutory formula demonstrates the dependence of the methods on assumptions, analogies and other judgmental opinions. Although the Tax Court said there was "nothing wrong with [the Random House] methodology, [the Tax Court was] not convinced that it produces a more accurate apportionment formula than the one calculated by the Comptroller." The agency held that Random House had "not met its burden of proving grossly distorted results." The reasons given by the Tax Court, which relate to the uncertainties in the Random House methods, are factually supported by the record as shown above. Consequently, the thrust of the Random House argument to us is that it is illegal, and indeed, unconstitutional, for the Tax Court to have failed to devise, or to have ordered the Comptroller to devise, some method for reflecting the value of subsidiary rights in the denominator of the property factor of the formula.

Establishing a reliable reference point would be one way of making the relative judgment that the income attributed

to Maryland by the Comptroller is " 'out of all appropriate proportion to the business transacted' " by Random House in this state. *Exxon Corp. v. Wisconsin Department of Revenue,* 447 U.S. 207, 220, 100 S.Ct. 2109, 2122, 65 L.Ed.2d 66, 83 (1980) (quoting *Hans Rees' Sons, Inc. v. North Carolina,* 283 U.S. 123, 135, 51 S.Ct. 385, 389, 75 L.Ed. 879, 908 (1931)); and see *Xerox Corp. v. Comptroller, supra,* 290 Md. at 147, 428 A.2d at 1220. The point is illustrated by *Hans Rees' Sons v. North Carolina, supra,* which invalidated the apportionment to North Carolina of between 66% and 85% of the taxpayer's income over a number of years under a North Carolina formula based entirely on tangible property. Under a separate accounting method presented by the taxpayer the apportionment to North Carolina was no more than 21.7%. 283 U.S. at 134. That separate accounting, however, had been "purposely skewed to resolve all doubts in favor of the State...." *Container Corp. v. Franchise Tax Bd.,* 463 U.S. 159, 183, 103 S.Ct. 2933, 2949, 77 L.Ed.2d 545, 564 (1983).

*Container Corp.* involved California's three-factor apportionment of the income of a nondomiciliary, multinational, unitary business which manufactured corrugated containers. The taxpayer directed its principal attack against the assessor's payroll factor which had utilized the wage rates prevailing in foreign countries. 463 U.S. at 181, 103 S.Ct. at 2948. The percentage increase in taxable income apportioned to California by the assessor over that determined by the methodology employed by the taxpayer was approximately 14%. *Id.* at 184, 103 S.Ct. at 2950. The Court said that 14% was "a figure certainly within the substantial margin of error inherent in any method of attributing income among the components of a unitary business." *Id.* Here, in relation to the Random House calculations, the increase in taxable income apportionable to Maryland is under 10%. This potential increase certainly falls within the limits suggested by the Supreme Court in *Exxon Corp., supra,* 447 U.S. at 223, 100 S.Ct. at 2120: "If a company is a unitary business, then a State may apply an apportion-

ment formula to the taxpayer's total income in order to obtain a 'rough approximation' of the corporate income that is 'reasonably related to the activities conducted within the taxing State.' "

 Random House seeks to use *Container Corp.* to its advantage by asserting that the case stands for the proposition that an apportionment must be fair. Random House claims that the fairness principle is violated as a matter of law when the Comptroller includes subsidiary rights income in the apportionable basis without including some kind of valuation of subsidiary rights as intangible property in the property factor denominator. Random House seems to treat the principle of fairness as if it existed independently of the absence of gross disproportionality. In theory, there is only one principle—fairness. But to demonstrate in practice that the principle has been violated in a particular case the taxpayer must prove disproportionality to a constitutionally significant degree. The Court in *Container Corp.* made this plain when it said:

We turn now to the question of fair apportionment. Once again, appellant has the burden of proof; it must demonstrate that there is " 'no rational relationship between the income attributed to the State and the intrastate values of the enterprise,' " ... by proving that the income apportioned to California under the statute is "out of all appropriate proportion to the business transacted by the appellant in that State," *Hans Rees' Sons, Inc.*, 283 U.S., at 135 [51 S.Ct. at 389]. [463 U.S. at 180–81, 103 S.Ct. at 2948 (citations omitted).]

Random House cites the dissent of Justice Stevens in *Mobil Oil Corp. v. Comm'r of Taxes*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980) to support its position of *per se* illegality in the assessment. Vermont had included in the apportionable basis dividends received by Mobil from subsidiaries and affiliates operating in foreign countries. The majority of the Court concluded that Mobil had not raised the issue of whether Vermont's formula, as applied, had produced a fair attribution of Mobil's dividend income,

445 U.S. at 441 n. 15, 449, 100 S.Ct. at 1233 n. 15, 1237, but Justice Stevens concluded that the taxpayer had preserved that issue. He then said:

> But of greatest importance, the record contains no information about the payrolls, sales or property values of any of those corporations, and Vermont has made no attempt to incorporate them into the apportionment formula computations. Unless the sales, payroll, and property values connected with the production of income by the payor corporations are added to the denominator of the apportionment formula, the inclusion of earnings attributable to those corporations in the apportionable tax base will inevitably cause Mobil's Vermont income to be overstated. [445 U.S. at 460–61, 100 S.Ct. at 1243 (footnote omitted).]

The effect addressed by Justice Stevens in *Mobil* is not present in the case before us. Justice Stevens believed that Vermont had

> indefensibly used its apportionment methodology artificially to multiply its share of Mobil's 1970 taxable income perhaps as much as tenfold[, *i.e.*, 1,000%]. [*Id.* at 461, 100 S.Ct. at 1243 (footnote omitted).]

■ Moreover, the relationship between Mobil's sales, property, and payroll in Vermont, which related exclusively to the retailing aspect of a unitary, international, vertically integrated petroleum business and income from dividends paid by foreign subsidiaries is more attenuated than the relationship involved here. What is required, in addition to a nexus between the interstate activities and the taxing state, is "a rational relationship between the income attributed to the State and the intrastate values of the enterprise." *Mobil, supra,* 445 U.S. at 437, 100 S.Ct. at 1231; *Xerox Corp., supra,* 290 Md. at 143, 428 A.2d 1208. The dollar amounts utilized in the numerator of the property factor applied by the Comptroller reflected the presence in Maryland of Random House's inventory, shipping, and billing operations for the works which it published directly, in relation to all tangible property of Random House. In the

instant case the Tax Court relied on its prior finding that "[b]uyers of subsidiary rights must likewise see advantages stemming from the publicity generated by hardback publication before, during, or after exercise of their subsidiary rights." Simply put, a work which is popular in hardback likely is printed in more volumes by Random House and likely produces higher subsidiary rights income than an unpopular work.[5] This correlation between the Maryland tangible property, payroll, and sales and the amount of subsidiary rights income received by Random House is the required rational relationship.

■ Random House argues that the Comptroller has been inconsistent because, in *Xerox, supra,* he added the net book value of the taxpayer's copyrights and patents to the denominator of the property factor when he increased Xerox's reported apportionable basis by including interest on loans made to foreign subsidiaries and royalty income for the use of patents, trademarks, copyrights, and business know-how. 290 Md. at 132, 428 A.2d 1208. Xerox carried its copyrights and patents on its books as assets, *id.* at 140, 428 A.2d 1208, but Random House does not value subsidiary rights in its accounting. That is a rational basis for the difference in treatment. In any event, the Comptroller was not specifically compelled to value Random House's subsidiary rights when the method used by him produced an apportionment which has not been shown to fall outside of constitutional tolerances.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.

---

5. By this generalization we do not imply that every work in inventory at any time in Maryland produces subsidiary rights income. For example, publisher Jonathan Cape, when asked if he kept a copy of every book he printed, is reported to have replied that he kept " 'thousands.' " J. Charlton, *The Writer's Quotation Book* at 101 (1985 rev. ed.).