575 A.2d 324

**CBS INC.**

v.

**COMPTROLLER OF THE TREASURY.**

No. 136, Sept. Term, 1989.

Court of Appeals of Maryland.

June 25, 1990.

Alvan L. Bobrow (Charles B. Bayly, Jr., CBS, Inc., New York City, L. Paige Marvel, and Todd K. Snyder, Venable, Baetjer & Howard, Baltimore, on brief), for appellant.

John K. Barry, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Gerald Langbaum, Asst. Atty. Gen., on brief), Annapolis, Md., for appellee.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and CHASANOW, JJ., and CHARLES E. ORTH, Jr., J. (retired, Specially Assigned).

ADKINS, Judge.

In *Consumer Protection v. Consumer Pub.*, 304 Md. 731, 755, 501 A.2d 48, 61 (1985), we observed that "[t]his Court has not addressed the question of when, if ever, an agency is required to proceed by rulemaking" as opposed to adjudication. On the record there before us we held that it was "appropriate" for the agency "to proceed by adjudication...." *Id.* at 755–756, 501 A.2d at 61. We now revisit that topic. Although we do not depart from our holding in *Consumer Protection*, we conclude that on the record now presented, the agency was required to adopt a policy change via rulemaking.

The agency here is the appellee, the Comptroller of the Treasury (the Comptroller). The taxpayer which insists that rulemaking is mandatory under the circumstances of this case is appellant, CBS, Inc. (CBS). The factual back-

ground of the controversy between them is largely undisputed.

## I.

CBS is a New York corporation. In 1980 and 1981, the tax years here involved, as well as prior thereto, its headquarters were in New York City. It conducted numerous activities, including the manufacture and sale of records, tapes, musical instruments, and toys; the publication of books and magazines; and the ownership and operation of five television stations, seven AM and FM radio stations, and television and radio networks. Its physical presence in Maryland was minimal: a records division sales office in Silver Spring and a toy manufacturing plant in Hagerstown. Both of these enterprises were conducted as CBS divisions, not as separate corporations.

Also organized as divisions were the network operations, which provided advertising services to those who wished to broadcast commercials or other messages. The network broadcasting facilities, the related sales offices, and the network employees staffing them were all outside of Maryland. Some 70 percent of CBS's net income was derived from network advertising receipts.

Prior to 1980 and 1981 and, indeed, in those years, CBS, as a unitary business, computed its Maryland taxes by using the three-factor formula now prescribed by Maryland Code (1989) Tax–General Article, § 10–402(c).[1] The formula is a method by which a multi-state corporation apportions an appropriate part of its taxable income to Maryland. The factors are sales, property, and payroll. Each factor is a fraction.

"The numerator of the sales factor, for example, is the amount of a corporation's in-state sales; the denominator

---

1. During the years in question, this formula appeared in Maryland Code (1957, 1975 Repl.Vol. and 1987 Supp.) Article 81, § 316. Since the current provision was enacted without substantive change, we refer to it for convenience.

of the sales factor is the total amount of a corporation's in-state and out-of-state sales. The property and payroll factors are computed in the same manner. The three factors are averaged and the resulting fraction, expressed as a percentage, is multiplied by the corporation's business income. The resulting dollar amount constitutes the business income apportioned to this State. The applicable tax rate is then applied to the corporation's apportioned income."

*NCR Corp. v. Comptroller*, 313 Md. 118, 141, 544 A.2d 764, 775 (1988) (quoting *Xerox Corp. v. Comptroller*, 290 Md. 126, 130, 428 A.2d 1208, 1211 (1981)). *See also Random House v. Comptroller*, 310 Md. 696, 701, 531 A.2d 683, 685 (1987).

CBS included all income from network advertising receipts in its total apportionable business income. Because there was neither network payroll nor network property located in Maryland, those components of the formula were included in the denominator but not the numerator. The advertising receipts were attributed to states other than Maryland. This method of attribution, as the parties stipulated in the Tax Court, "was reviewed during the audits of prior years CBS'[s] Maryland corporate income tax returns, and no adjustment to the sales factor to account for advertising receipts was ever proposed." But when the 1980 and 1981 returns were audited, the Comptroller for the first time insisted on application of the audience-share method with respect to the sales factor. This resulted in the addition to the numerator of that factor of a part of the network advertising receipts, using a ratio calculated to compare the network audience in Maryland to the total network audience. The new approach produced a significant increase in taxes for 1980 and 1981.

After a hearing officer in the Comptroller's Income Tax Division upheld the auditor's decision, CBS sought relief in the Tax Court. It did not attack the fairness of the new approach, but argued that such a change in policy must be accomplished by rulemaking, not by *ad hoc* adjudication.

The Tax Court agreed. The Comptroller in his turn appealed and persuaded the Circuit Court for Baltimore City to the contrary. We issued a writ of certiorari before any proceedings were taken in the Court of Special Appeals. 318 Md. 2, 566 A.2d 754 (1989).

## II.

State legislatures ordinarily delegate express or implied authority to their agencies to issue rules after rulemaking proceedings and to issue orders after adjudicatory proceedings. As a result, legislative delegations enable agencies to elaborate agency law in a form—rules—that resembles statutes, and also in a form—orders—that resembles the case-by-case, common-law precedents of courts. That is, administrative agencies are typically authorized to make their law by directly binding prescriptive statements of general applicability in rulemaking and by individual decisions of particular applicability in adjudication which serve as precedent for future cases.

Bonfield, *Mandating State Agency Lawmaking by Rule*, 2 B.Y.U.J. of Pub.L. 161, 162–163 (1988). So it is in Maryland.

The Comptroller "shall adopt reasonable regulations to administer the provisions of the tax laws...." Section 2–103, Tax–General Article.[2] The Maryland Administrative Procedure Act (APA) defines a regulation (for present purposes synonymous with "rule") as

a statement or an amendment or repeal of a statement that: (i) has general application; (ii) has future effect; (iii) is adopted by a unit to: 1. detail or carry out a law that the unit administers ... and (iv) is in any form, including: 1. a guideline; 2. a rule; 3. a standard; 4. a

---

**2.** Former Article 81, § 304(a), in effect when CBS's returns were audited, gave the Comptroller "power" and made it his "duty to promulgate such rules and regulations ... as may be necessary for the enforcement of" tax laws.

standard of interpretation; or 5. a statement of poli-
cy....

Md.Code (1984, 1989 Cum. Supp.), § 10–101(e)(1), State
Government Article. When an agency, or unit, undertakes
to act by rulemaking, it ordinarily must follow specified
procedures that include notice, hearing, and publication
procedures. State Government Article §§ 10–109 through
10–113.

Of course, an agency also may act by making an order in
a contested case. *See* State Government Article, §§ 10–201
through 10–214. The question we must decide is whether it
was appropriate for the Comptroller to change the tax
treatment afforded CBS by the latter method (in effect, by
adjudication) or whether he was required to do so via the
APA rulemaking process.

The seminal decision in this area is *S.E.C. v. Chenery
Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).
There, the Supreme Court observed that "[t]he function of
filling in the interstices of the [Holding Company] Act
should be performed, as much as possible, through [the]
quasi-legislative promulgation of rules to be applied in the
future." *Id.* at 202, 67 S.Ct. at 1580, 91 L.Ed. at 2002. But
the Court declined to adopt "any rigid requirement to that
effect" because to do so "would make the administrative
process inflexible and incapable of dealing with many of the
specialized problems which arise." *Id.* at 202, 67 S.Ct. at
1580, 91 L.Ed. at 2002. It made plain that in certain
situations

> the agency must retain power to deal with the problems
> on a case-to-case basis if the administrative process is to
> be effective. There is thus a very definite place for the
> case-by-case evolution of statutory standards. And the
> choice made between proceeding by general rule or by
> individual, *ad hoc* litigation is one that lies primarily in
> the informed discretion of the administrative agency....

*Id.* at 203, 67 S.Ct. at 1580, 91 L.Ed. at 2002 [emphasis in
original; citations omitted]. *See also NLRB v. Bell Aero-*

*space Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134, 154 (1974).

Despite an apparent academic preference for broader use of rulemaking[3] and some judicial decisions that severely limit policy-making by adjudication,[4] the *Chenery—Bell Aerospace* view is the dominant one. Bonfield, *supra,* at 163. We recognized this in *Consumer Protection, supra.* Judge Eldridge, for the Court, thoroughly reviewed the federal and state authorities and observed that "most courts have allowed agencies broad discretion in choosing whether to develop policy by rulemaking or adjudication." 304 Md. at 755, 501 A.2d at 60. The following year we reaffirmed that position when Chief Judge Murphy wrote for the Court, "[i]t is a well settled principle of administrative law that 'the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency.'" *Baltimore Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 168, 501 A.2d 1307, 1319 (1986) (quoting *Chenery,* 332 U.S. at 203, 67 S.Ct. at 1580, 91 L.Ed. at 2002).

■ But although the Comptroller would have it otherwise, we did not in *Consumer Protection* entirely reject

---

**3.** *See, e.g.,* K. Davis, *Administrative Law Treatise,* §§ 7:25–7:25–1 (Supp.1989); Bonfield, *Mandating State Agency Lawmaking by Rule,* 2 B.Y.U.J. of Pub.L. 161, 168–180 (1988); Mayton, *The Legislative Resolution of the Rulemaking Versus Adjudication Problem in Agency Lawmaking,* 1980 Duke L.J. 103; Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy,* 78 Harv. L.Rev. 921, 928–972 (1965).

**4.** *See, e.g., Ford Motor Co. v. F.T.C.,* 673 F.2d 1008 (9th Cir.1981), *cert. denied,* 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 394 (1983); *Gonzalez v. Freeman,* 334 F.2d 570 (D.C.Cir.1964); *Elizondo v. State, Dep't of Revenue,* 194 Colo. 113, 570 P.2d 518 (1977); *Polaroid Corp. v. Commissioner of Revenue,* 393 Mass. 490, 472 N.E.2d 259 (1984); *Metromedia, Inc. v. Director, Div. of Taxation,* 97 N.J. 313, 478 A.2d 742 (1984); *McLean Trucking Co. v. Lindley,* 70 Ohio St.2d 106, 435 N.E.2d 414 (1982); *Megdal v. Oregon State Bd. of Dental Examiners,* 288 Or. 293, 311–318, 605 P.2d 273, 282–285 (1980); *Department of Revenue v. United States Sugar Corp.,* 388 So.2d 596 (Fla.Dist.Ct.App.1980).

cases like *Ford Motor Co. v. F.T.C.*, 673 F.2d 1008 (9th Cir.1981), *cert denied,* 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 394 (1983), and *Metromedia, Inc. v. Director, Div. of Taxation,* 97 N.J. 313, 478 A.2d 742 (1984); *see* n. 4, *supra.* We merely noted that the agency action there before us would have been appropriate for adjudicative determination "even under the restrictive view expressed in *Ford Motor Co. v. F.T.C., supra.*" 304 Md. at 755–756, 501 A.2d at 60–61. That was because the administrative agency "did not change existing law or even formulate rules of widespread application." *Id.* at 756, 501 A.2d at 61. Nor did we, in *Baltimore Gas & Elec.,* say that agency discretion to choose between rulemaking and adjudication could never be reviewed. When we rejected the argument that rulemaking should have been required there, Chief Judge Murphy pointedly observed for the Court that it was "not a case ... in which materially modified or new standards were applied retroactively to the detriment of a company that had relied upon the [agency's] past pronouncements." 305 Md. at 169, 501 A.2d at 1319. Our cases support the proposition that the administrative process is enhanced when an agency is allowed substantial flexibility to decide between establishing policy by way of rule or by way of adjudication. The discretion to choose may, however, be abused. *Bell Aerospace,* 416 U.S. at 294, 94 S.Ct. at 1771, 40 L.Ed.2d at 154. Under the circumstances of this case, it was.

### III.

Some courts have required policy announcements by rulemaking when an agency has been delegated rulemaking power, and when an administrative procedure act, like our APA, has defined "rule" or "regulation" and has established procedures for the adoption of such a policy statement. Those courts have held that legislative intent mandates use of the rulemaking process when the agency action falls within the statutory definition of "rule" or "regulation." *See, e.g., Sun Ray Drive–In Dairy, Inc. v. Oregon*

*Liquor Control Comm'n*, 16 Or. App. 63, 70, 517 P.2d 289, 292–293 (1973); *see also Megdal v. Oregon State Bd. of Dental Examiners*, 288 Or. 293, 311–317, 605 P.2d 273, 282–285 (1980). Others hold that due process requires rule-adopted specifics to implement general statutory standards. *See, e.g., Elizondo v. State Dept. of Revenue*, 194 Colo. 113, 117–119, 570 P.2d 518, 521–522 (1977). Still others require rulemaking whenever "an agency seeks to change the law, and establish rules of widespread application." *See, e.g., Ford Motor Co., supra*, 673 F.2d at 1009. A similar message is delivered by the line of New Jersey cases typified by *Metromedia, supra.* The facts of that case are virtually on all fours with the facts of this one. On those facts, the Supreme Court of New Jersey decided that rulemaking was mandatory when the agency determination (1) was intended to be applied as a general standard, (2) dealt with broad policy issues transcending those of the individual litigants and affecting a large segment of the regulated public, and (3) effected a material change in existing law. 97 N.J. at 330–331, 478 A.2d at 750–751. *See also State, Dep't of Envtl. Protection v. Stavola*, 103 N.J. 425, 511 A.2d 622 (1986); *Crema v. New Jersey Dep't of Envtl. Protection*, 94 N.J. 286, 463 A.2d 910 (1983); *Boller Beverages, Inc. v. Davis*, 38 N.J. 138, 183 A.2d 64 (1962); *613 Corp. v. State, Div. of State Lottery*, 210 N.J. Super. 485, 510 A.2d 103 (App.Div.1986); *Board of Educ. v. Cooperman*, 209 N.J. Super. 174, 507 A.2d 253 (App.Div.1986).

As a number of the cases requiring rulemaking indicate, this mode of procedure adds an aspect of fairness when an agency intends to make a change in existing law or rule. That fairness is produced by prospective operation of a new rule and by the public notice, public hearing, and public comment processes that accompany rulemaking, but that are sometimes absent from administrative adjudication. *Cooperman*, 209 N.J. Super. at 201–202, 507 A.2d at 268–269. *See also* K. Davis, *Administrative Law Treatise*, § 7:25, at 119 (2d ed. 1979) ("As a means of making new law, rulemaking is superior to adjudication in two main

respects: (1) It is normally prospective, ... and (2) rulemaking procedure may allow participation of nonparties who may be affected ..."); Bonfield, *supra,* at 168–180; Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy,* 28 Harv. L.Rev. 921, 930–972 (1965). The advantages of rulemaking in certain circumstances reinforce the view that this procedure may sometimes be required. We do not attempt to make an all-encompassing statement of what those circumstances may be. But we do conclude, as did the Attorney General in 1980, that when a policy of general application, embodied in or represented by a rule, is changed to a different policy of general application, the change must be accomplished by rulemaking. *See* 65 Op. Att'y Gen. 396, 404–406 (1980). That is the sort of change that occurred here, as the Tax Court's fact-finding indicates.

### IV.

At the time of the tax years here involved, COMAR § 03.04.01.03E fleshed out the statutory three-factor formula for apportioning the income of a unitary corporation. In paragraph (6) the regulation or rule defined the sales factor as

(a) ... a fraction, the numerator of which is the total sales of the taxpayer in this State during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period.

(b) Sales of tangible personal property are in this State if the property is delivered or shipped to a purchaser within this State regardless of the f.o.b. point or other conditions of the sale.

(c) Sales other than sales of tangible personal property are in this State if: (i) The income-producing activity is performed in this State; or (ii) The income-producing activity is performed both within and outside this State and a greater proportion of the income-producing activity is performed in this State than in any other state, based on costs of performance.

This rule does not expressly refer to advertising revenues of national broadcasting companies; no rule in effect during the years here in question did so. The rule does, however, expressly refer to "[s]ales other than sales of tangible personal property" and this language is certainly broad enough to cover sales of advertising.

In the Tax Court, the parties stipulated that when CBS filed tax returns (while this regulation was in effect) it attributed its advertising receipts to states other than Maryland. "This method of apportionment was reviewed during the audits of prior years CBS'[s] Maryland corporate income tax returns, and no adjustment to the sales factor to account for advertising receipts was ever proposed." Stipulation, Joint Record Extract at 19. Thus, it is a permissible inference that the Comptroller interpreted COMAR § 03.04.01.03E(6) as not requiring the inclusion of national advertising revenues in the numerator of the sales factor. Since the stipulation refers to "audits [plural] of prior years [plural]," it is also inferable that this was the established policy of the Comptroller until the 1980–1981 audits. There is no showing that this policy was applied only to CBS. It was like the Racing Commission's unwritten policy against Sunday racing that the Attorney General opined had to be changed by rule. 65 Op. Att'y Gen. 396, *supra.*

The Tax Court found that the change to the audience share method of apportioning advertising revenue was "a substantial deviation from COMAR § 03.04.01.03E(6)[ ]"; that "in no way can this change be termed refinement"; and that the change "was an agency statement of interpretation and policy having general application, future effect and adopted to carry out the Comptroller's taxing authority." Therefore, "the adjustment constitutes an administrative regulation." Memorandum of Tax Court decision, Joint Record Extract at 23–25.

■ Section 13–532 of the Tax—General Article narrowly limits judicial review of decisions of the Tax Court. A reviewing court must affirm the Tax Court if its order "is

not erroneous as a matter of law" and if the order "is supported by substantial evidence appearing in the record." *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 834, 490 A.2d 1296, 1300–1301 (1985). Moreover, a "reviewing court may not substitute its judgment for the expertise of the agency; [the court] must review the agency's decision in the light most favorable to it; ... the agency's decision is prima facie correct and presumed valid; and ... it is the agency's province to resolve conflicting evidence" and to draw inferences from that evidence. *Id.* at 834–835, 490 A.2d at 1301.

Although the record is not as full as we might wish, we think it was sufficient to support the fact-finding of the Tax Court, made in light of its special expertise in this area. Further, we think the Tax Court understood the applicable law. Hence we apply the deferential standard of review not only to its fact-finding and its drawing of inferences, but also to its "application of the law to the facts." *Friends School v. Supervisor*, 314 Md. 194, 200 n. 2, 550 A.2d 657, 660 n. 2 (1988).

The circuit court thought that the Tax Court had erred as a matter of law. First, it seemed to believe that cases like *NCR Corp.*, 313 Md. at 147, 544 A.2d at 778, and *Random House*, 310 Md. at 705, 531 A.2d at 687, gave the Comptroller free rein to change the three-factor formula whenever it is appropriate to do so, and by any means the Comptroller selects. Those cases certainly refer to the Comptroller's "discretion" and "right" to change the formula in a proper case. They do not, however, discuss the method that the Comptroller may or must use to exercise that discretion. Neither does § 10–402(d) of the Tax–General Article nor COMAR § 03.04.01.03G, which was in effect during the tax years here involved. "It does not follow that, because [an agency] has statutory discretion, the *manner* in which this discretion is exercised is not governed by the standards that determine whether rulemaking or adjudication must be followed in a given case." *Metromedia*, 97 N.J. at 333, 478 A.2d at 752 [emphasis in original]. We point out that in

neither *NCR* nor *Random House*, was there argument about whether under certain circumstances, the formula had to be modified by rulemaking. As a consequence, neither decision addressed that issue. The same is true of cases like *Xerox*, 290 Md. at 146-147, 428 A.2d at 1219-1220, and *Ward Europa, Inc. v. Comptroller*, 66 Md. App. 332, 344-348, 503 A.2d 1371, 1377-1379 (1986).

Second, the circuit court seemed to believe that absent an explicit rule dealing with advertising revenues of national broadcasting companies, there could be no general rule or policy, alteration of which might have to be by rule. We have already disposed of that argument.

Finally, the circuit court concluded that in *Consumer Protection* we had totally rejected the *Metromedia* line of cases and adopted a rule of law under which an agency like the Comptroller had absolute and apparently unreviewable discretion to announce policy changes either by rulemaking or by adjudication. As we have explained, that was not the holding of *Consumer Protection*.

◼ As a consequence, the circuit court erroneously failed to affirm the decision of the Tax Court. The effect of the Comptroller's audit was to announce a substantially new generally applicable policy with respect to apportionment of the network advertising income of national broadcasting corporations. That change, for practical purposes, amounted to a change in a generally applicable rule. Unlike the agency action in *Consumer Protection*, it *was* an effective "change [in] existing law" and *did* "formulate rules of widespread application." 304 Md. at 756, 501 A.2d at 61. Unlike the agency action in *Baltimore Gas & Elec.* it *was* "a case ... in which materially modified or new standards were applied retroactively to the detriment of a company that had relied upon the [agency's] past pronouncements." 305 Md. at 169, 501 A.2d at 1319. Under these circumstances, we hold that the new policy had to be

promulgated pursuant to the rulemaking procedures of the APA.[5]

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTION TO AFFIRM THE JUDGMENT OF THE TAX COURT. COSTS TO BE PAID BY APPELLEE.

---

5. This holding does not preclude the Comptroller from adjusting the formula on a case-by-case basis when there are peculiar or unusual circumstances that apply to a particular taxpayer. There is no showing that CBS's circumstances with respect to network advertising are peculiar or unusual, or that they differ from those of any other national broadcasting company.