681 A.2d 484

# DEPARTMENT OF HEALTH AND MENTAL HYGIENE

v.

## CHIMES, INC.

**No. 94, Sept. Term, 1995.**

Court of Appeals of Maryland.

Aug. 27, 1996.

Andrew H. Baida, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Thomas W. Keech, Asst. Atty. Gen., on brief), Baltimore, for Petitioner.

Laurence B. Russell (Deborah M. Thompson, Ober, Kaler, Grimes & Shiver, on brief), Baltimore, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

The issue in this case is whether the Developmental Disabilities Administration in the Department of Health and Mental Hygiene violated the Maryland Administrative Procedure Act by instituting a cost containment measure without following "notice and comment" or emergency rulemaking procedures.

## I

In 1952, the Commission on Administrative Organization of the State, appointed by Governor McKeldin, recommended adoption of the 1946 Model State Administrative Procedure Act (MSAPA) "to the end that administrative agencies may be subjected to essential controls but not unduly hampered in the performance of their functions." Seventh Report of the Commission on Administrative Organization of the State 70 (1952). That statute was designed to ensure that "certain basic principles of common sense, justice and fairness," including notice to interested parties, are applied in administrative procedures, *Id.*, "without unduly restricting the agencies in the performance of their various tasks." *Id.* at 8; *see also* Maryland Code (1995 Repl.Vol., 1995 Supp.) § 10–201 of the State Government Article (declaration of policy); Commission to Revise the Administrative Procedure Act, Initial Report on Subtitles 2 and 4 of the APA 2 (1992). The

Maryland Administrative Procedure Act (APA), adopted by Ch. 94 of the Acts of 1957 and based on the MSAPA, therefore, sought to balance the State's interest in efficient administration against the individuals' interest in fairness. *Cf.* Bonfield, *State Administrative Rule Making* § 1.2.2 (1986 & Supp.1993) (discussing the 1981 MSAPA); *Woodland Private Study Group v. State,* 109 N.J. 62, 533 A.2d 387, 393 (1987) (in determining whether the intra-agency statements exception from the New Jersey APA applies, the court focuses upon "whether the agency's interest in streamlined procedure is outweighed by the importance of the interests that are affected."); *see also Emma Ah Ho v. Cobb,* 62 Haw. 546, 617 P.2d 1208, 1213 (1980) (discussing the federal APA contracts exception).

The APA requires State agencies to submit proposed regulations [1] to the Attorney General for approval as to legality,

---

**1.** Section 10–101(g) (formerly paragraph e) of the APA defines "Regulation" as follows:

(1) "Regulation" means a statement or an amendment or repeal of a statement that:
  (i) has general application;
  (ii) has future effect;
  (iii) is adopted by a unit to:
    1. detail or carry out a law that the unit administers;
    2. govern organization of the unit;
    3. govern the procedure of the unit; or
    4. govern practice before the unit; and
  (iv) is in any form, including:
    1. a guideline;
    2. a rule;
    3. a standard;
    4. a statement of interpretation; or
    5. a statement of policy.
(2) "Regulation" does not include:
  (i) a statement that:
    1. concerns only internal management of the unit; and
    2. does not affect directly the rights of the public or the procedures available to the public;
  (ii) a response of the unit to a petition for adoption of a regulation under § 10–123 of this subtitle; or
  (iii) a declaratory ruling of the unit as to a regulation, order, or statute, under Subtitle 3 of this title.
(3) "Regulation", as used in §§ 10–110 and 10–111.1, means all or any portion of a regulation.

§ 10–107(b) of the State Government Article, and also to the Joint Committee on Administrative, Executive, and Legislative Review (AELR Committee) for preliminary review 15 days prior to publication. § 10–110(b). The agency must publish the proposed regulation in the Maryland Register and may adopt the regulation 45 days later. § 10–111(a)(1). For 30 out of the 45 days, the agency must accept public comment on the proposed regulation. § 10–111(a)(3). The AELR Committee may delay adoption of the regulation to allow more time for review. § 10–111(a)(2)(i). The AELR Committee considers whether the regulation is in conformity with the statutory authority of the agency and the legislative intent of the statute under which the regulation is promulgated. § 10–111.1(b). If the AELR Committee votes to oppose adoption of the regulation, the agency may withdraw or modify the regulation, or submit it to the Governor for approval. § 10–111.1(c)(2). The Governor may then order the agency to withdraw, modify, or adopt the regulation. § 10–111.1(c)(3). Notice of the adoption of the regulation must be printed in the Maryland Register. § 10–114. This process is commonly known as "notice and comment" rulemaking.

The APA also provides for "Emergency Adoption" of regulations. If an agency deems it necessary, § 10–111(b)(1) allows immediate adoption of regulations by submitting the regulation and a fiscal impact statement to the AELR Committee. A majority of the AELR Committee or the chair or co-chair may approve the regulation. § 10–111(b)(2)(i). A public hearing must be held at the request of any member of the AELR Committee. § 10–111(b)(2)(ii). The circuit courts must declare invalid any regulation adopted in violation of these procedures. § 10–125(d).

## II

The Developmental Disabilities Administration (DDA) in the Department of Health and Mental Hygiene is charged with developing a State plan to provide services to persons with developmental disabilities through "consultation, cooperation, contract, or direct operation" of facilities. Maryland Code

(1994 Repl.Vol., 1995 Supp.) § 7–303—305 of the Health–Gen. Article. DDA may provide for community-based residential programs such as public or private group homes or alternative living units. § 7–601. The Chimes, Inc. is one of 93 private entities with which DDA contracts to provide such services.

In 1987, DDA established by regulation the "Prospective Payment System" (PPS) for reimbursement of private providers. Code of Maryland Administrative Regulations (COMAR) 10.22.17. The regulation incorporates by reference the "Prospective Payment System for Community Services to the Mentally Retarded and Developmentally Disabled Clients Procedures Manual (First Edition)" (Manual). COMAR 10.22.17.02.A. The Manual explains that the PPS is "a system based on a fixed price per day per client." Manual at 800–3. It is intended to give providers the incentive to provide quality care efficiently and the flexibility to develop innovative programs, as well as to give accountability to providers and DDA. *Id.*

To be included in the PPS, a provider must operate under a grant contract for two years, giving DDA the opportunity to review the provider's costs. When a provider is accepted into the PPS, it is exempted from the State's competitive bidding requirements. Maryland Code (1995 Repl.Vol., 1995 Supp.) § 11–101(n)(2)(iii) of the State Fin. & Proc. Article.

Under the PPS, payments to providers are based on two categories of costs or "cost centers." COMAR 10.22.17.10.A. The first is the Client Assessment Sub–System, or "the costs of providing routine services to clients," COMAR 10.22.17.01.-B.(25), and is not at issue in this case. The second set of cost centers is the Provider Component which includes administration, general, capital, special, and transportation costs. COMAR 10.22.17.01.B.(51). DDA bases reimbursement rates upon reports submitted by the providers. COMAR 10.22.17.06. DDA eliminates costs that are not reimbursable, such as advertising and lobbying expenses, COMAR 10.22.17.13, and adjusts the reimbursement rate for inflation and attendance rates. Manual at 800–9.

Sections 7–205 and 7–234(a) of the State Finance & Procurement Article prohibit State agencies from spending money in excess of budget appropriations. The DDA regulation, accordingly, establishes that the PPS "is subject to the budget appropriations approved by the Legislature." COMAR 10.22.17.02.E. The regulation further provides:

> The Department may take cost containment measures to control total expenditures on the prospective payment system. These cost containment measures may include, but are not limited to:
>
> (1) Sharing in any surplus on prospective payments less actual cost;
>
> (2) Establishing limits on the percentage of the prospective payment rate for any cost center.

COMAR 10.22.17.08.A. In addition, the Manual provides that "[o]ther cost containment measures for budgetary control may also be necessary." Manual at 800–8. The regulation and the Manual were incorporated into the "Provider Agreement" between DDA and Chimes in paragraph IA in which Chimes agreed to comply with the applicable statutes and regulations, as well as "transmittals and guidelines issued by the Department."

To stay within budget appropriations, DDA has instituted numerous cost containment measures over the years. In fiscal year (FY) 1990, DDA set a ceiling for certain cost centers at one standard deviation above the average cost for all providers. DDA cut the annual inflation rate from 6% to 2.5% in FY 1991 and again to 0% in FY 1993. In FY 1992, DDA froze the hourly rates in the Client Assessment Subsystem. In FY 1993, the ceiling rate was calculated using a weighted average and was cut to .75 standard deviations above the mean. Beginning in FY 1993, DDA cut $37 per client per month from each provider's rate for 21 consecutive months. Providers were notified of these cost containment measures by memoranda from DDA. Although the agency did not follow APA "notice and comment" or emergency rulemaking proce-

dures in instituting these cost containments, no provider challenged any of these actions prior to this case.

In August 1993, DDA met with members of the Maryland Association of Community Services to discuss reimbursement rates for FY 1994. DDA subsequently notified providers in individually-addressed memoranda that it was taking several steps to control costs. At issue here is DDA's limitation on the growth in the administration, general, capital, and transportation cost centers to 7% for providers whose costs were below the mean and 4% for providers whose costs were above the mean. In FY 1994, DDA applied the "growth cap," calculating averages for each cost center separately. In FY 1995, DDA again imposed the "growth cap," using an aggregate of four cost centers to determine whether providers were above or below the mean. As a result of this action, Chimes' reimbursement rate was cut.[2]

Chimes initially appealed imposition of the "growth cap" to the PPS Appeal Board, which is empowered to hold evidentiary or oral hearings on the calculation of the reimbursement rate, the final reimbursement amount, and other disputes between providers and DDA. Manual at 700–3, 7. The PPS Appeal Board delegated its authority to the Office of Administrative Hearings (OAH). The parties filed cross motions for summary decision. The Administrative Law Judge (ALJ), ruled in favor of DDA. OAH, the ALJ held, "may rule on whether a statute or regulation was appropriately applied by the agency, but has no authorization to determine the validity of the regulation itself," and was, thus, without jurisdiction in this case.

Chimes then filed a Complaint for Declaratory Judgment in the Circuit Court for Baltimore County claiming that DDA's adoption of the 4%/7% "growth cap" violated the rulemaking procedures required under the Maryland APA. Both parties filed motions for summary judgment. Following a hearing,

---

2. Beginning in FY 1996, DDA voluntarily followed APA procedures in imposing the "growth cap." *See* Notice of Emergency Action, 22 Md. Reg. 1654 (1995).

the circuit court held, on January 25, 1995, that the "growth cap" was a regulation under the APA and was not within the "internal management" exception of § 10–101(g)(2)(i) of the APA. The court also rejected DDA's contention that the existing regulation (COMAR 10.22.17.08.A) grants DDA the authority to implement cost containment measures without following APA rulemaking procedures. It declared the "growth cap" invalid and later granted supplemental relief in the amount of $941,788 for FY 1994 and a similar amount for FY 1995, to be determined at the end of the fiscal year. DDA appealed to the Court of Special Appeals. Before arguments in that court, we granted a Writ of Certiorari.

### III

DDA argues that "[j]ust as an agency must have the discretion to decide whether to proceed by rulemaking or case-by-case adjudication, it must also possess the flexibility in applying existing regulations to respond to the myriad situations that it routinely confronts in the pursuit of its regulatory mission." Specifically, it says that the question presented is whether it must undergo "the rigorous and time-consuming requirements of the rulemaking process each time it seeks to implement existing regulations that authorize the State to take cost containment measures to stay within its budgetary appropriation in administering a government program through private contractors." It further says that the State's right to limit the amount that contractors may be reimbursed for their overhead costs does not constitute a quasi-legislative judgment giving rise to a new rule, but rather amounts to no more than the specific application of the core authority that underlies the entire PPS. In this regard, DDA explains that its action effected no change in existing law but merely applied a regulation that notified all participants in the PPS that the State has the right to impose the same cost containment measure that was implemented in this case. According to DDA, requiring that it amend its regulation each time it must account for unpredictable contingencies constitutes an unnecessary and costly burden on the State at the expense of

proper efficient and effective government. Thus, DDA maintains that it was authorized to impose cost containment measures without following APA rulemaking procedures.

In *Consumer Protection v. Consumer Pub.*, 304 Md. 731, 501 A.2d 48 (1985), the Maryland Attorney General proceeded by adjudication against a company which sold diet pills through the mail, alleging that its advertising was false and misleading in violation of the Maryland Consumer Protection Act. *Id.* at 737, 501 A.2d 48. The company claimed that since the same advertising practices were used industry wide, the rule would apply to many companies, and the Attorney General should have proceeded by rulemaking as required by the APA. *Id.* at 753, 501 A.2d 48. We held that the Attorney General was not required to proceed by rulemaking because he "did not change existing law or even formulate rules of widespread application." *Id.* at 756, 501 A.2d 48.

We again declined to require formal rulemaking procedures in *Baltimore Gas & Elec. v. Public Serv. Comm'n*, 305 Md. 145, 501 A.2d 1307 (1986). The Public Service Commission, when determining whether a utility is entitled to a fuel rate adjustment, is authorized by statute to consider whether the utility's plants operate at a "reasonable level." *Id.* at 152, 501 A.2d 1307. The Commission partially denied BG & E's requests for fuel rate adjustments to recover the costs of purchasing supplemental power during forced outages at BG & E's plants. The Commission determined that the outages were partially due to "managerial imprudence" and, thus, the plants were not operating at a "reasonable level." *Id.* at 153–55, 501 A.2d 1307. We held that the Commission was not required to proceed by rulemaking because the Commission had not applied "materially modified or new standards ... retroactively to the detriment of a company that had relied upon the Commission's past pronouncements." *Id.* at 169, 501 A.2d 1307.

The only time we have mandated that an agency proceed by rulemaking was in *CBS v. Comptroller*, 319 Md. 687, 692–93, 575 A.2d 324 (1990). In that case, the Comptroller used a new

method of calculating Maryland's share of CBS's advertising receipts. *Id.* at 690, 575 A.2d 324. We held:

> The effect of the Comptroller's audit was to announce a substantially new generally applicable policy with respect to apportionment of the network advertising income of national broadcasting corporations. That change, for practical purposes, amounted to a change in a generally applicable rule. Unlike the agency action in *Consumer Protection,* it *was* an effective "change [in] existing law" and *did* "formulate rules of widespread application." Unlike the agency action in *Baltimore Gas & Elec.* it *was* "a case ... in which materially modified or new standards were applied retroactively to the detriment of a company that had relied upon the [agency's] past pronouncements."

*Id.* at 699, 575 A.2d 324.

## IV

■ In this case, DDA did not formulate new rules of widespread application, change existing law, or apply new standards retroactively to the detriment of an entity that had relied upon the agency's past pronouncements. The "growth cap" at issue here applied only to a limited number of providers in their capacity as contractors with a state agency pursuant to contracts between the parties subject to termination by either side. Furthermore, the "growth cap" applied only in a particular program, in a particular year, and in response to a particular budget crisis. Thus, the "growth cap" was not a rule of widespread application.

■ The "growth cap" did not, as we said, change existing law. Both the statute and regulation limited DDA's expenditures to budget appropriations and the regulation and Manual provided for cost containment. The regulation specifically contemplated the need for "establishing limits on the percentage of the prospective payment rate for any cost center." COMAR 10.22.17.08.A. The "growth cap" merely effectuated these policies, but did not change the law. *Cf. Radiological Soc. v. New Jersey State Dept.,* 208 N.J.Super. 548, 506 A.2d

755, 760 (1986) (policy statement need not be promulgated as regulation where it "was simply a re-affirmation of the certificate of need requirements already enunciated in existing regulations ... and does not constitute a material and significant change from a clear, past agency position."); *Bendix Forest Etc. v. Div. of Occup. S. & H.*, 25 Cal.3d 465, 158 Cal.Rptr. 882, 887, 600 P.2d 1339, 1344 (1979) (state agency did not engage in rulemaking when it required an employer to provide gloves for employees, but merely implemented a regulation that provided "[h]and protection may be required for employees....").

▮ Finally, the "growth cap" did not apply new standards retroactively to the detriment of an entity that relied on prior agency pronouncements. The "growth cap" did not apply retroactively, but was instituted to control costs in the current fiscal year. The regulation and the Manual notified the providers that reimbursement was limited by budget appropriations and DDA had instituted numerous cost containment measures previously. In addition, DDA notified the providers that it needed to implement additional measures in FY 1994 and afforded them the opportunity to discuss various options for controlling costs.

Chimes' interest in fairness was substantially honored, despite the lack of APA procedures. On the other hand, DDA had a strong interest in adopting a cost containment policy as quickly as possible. DDA's FY 1996 adoption of the "growth cap" as a regulation through emergency adoption procedures took months to complete. Such a time lag is a huge burden on an agency administering a complex program such as the Prospective Payment System. As Judge Eldridge said for the Court in *Judy v. Schaefer*, "flexibility is needed in the administration of the budget in order for the State to run efficiently and to avoid deficits." 331 Md. 239, 261, 627 A.2d 1039 (1993) (upholding statute authorizing Governor to reduce budget appropriations by up to 25%).

We hold, therefore, that following the standards enunciated in *CBS, Baltimore Gas & Elec.,* and *Consumer Protection,* the

"growth cap" was not a "regulation" in the sense contemplated by the APA and need not have been promulgated according to APA rulemaking procedures. *See also Dep't v. Lions Manor Nursing Home,* 281 Md. 425, 430, 378 A.2d 1351 (1977) (nursing home vendor payment schedule was valid as a contract amendment regardless of its status under the APA).

*JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.*

BELL, J., dissents.

BELL, Judge, dissenting.

In this case, the majority holds that the Developmental Disabilities Administration ("DDA") of the Department of Health and Mental Hygiene did not violate the Maryland Administrative Procedure Act, Maryland Code (1984, 1995 Repl.Vol., 1995 Cum.Supp.) §§ 10–101—139 of the State Government Article, when it, without first promulgating a regulation,[1] instituted a cost containment measure applicable to the

---

1. Maryland Code (1984, 1995 Repl.Vol., 1995 Cum.Supp.) § 10–101(g) of the State Government Article provides:

(g) Regulation.-
  (1) "Regulation" means a statement or an amendment or repeal of a statement that:
    (i) has general application;
    (ii) has future effect;
    (iii) is adopted by a unit to:
      1. detail or carry out a law that the unit administers;
      2. govern organization of the unit;
      3. govern the procedure of the unit; or
      4. govern practice before the unit; and
    (iv) is in any form, including:
      1. a guideline;
      2. a rule;
      3. a standard;
      4. a statement of interpretation; or
      5. a statement of policy.
  (2) "Regulation" does not include:
  (i) a statement that:
      1. concerns only internal management of the unit; and
      2. does not affect directly the rights of the public or the procedures available to the public;

Prospective Payment System ("PPS").[2] Specifically, it concludes:

> In this case, DDA did not formulate new rules of widespread application, change existing law, or apply new standards retroactively to the detriment of an entity that had relied upon the agency's past pronouncements. The "growth cap" at issue here applied only to a limited number of providers in their capacity as contractors with a State agency pursuant to contracts between the parties subject to termination by either side. Furthermore, the "growth cap" applied only in a particular program, in a particular year, and in response to a particular budget crisis. Thus, the "growth cap" was not a rule of widespread application.

In doing so, it stresses several factors: the purpose of the APA[3]; the existence of regulations and a manual pertaining to the PPS[4]; the prohibition, contained in Maryland Code (1985,

---

(ii) a response of the unit to a petition for adoption of a regulation, under § 10–123 of this subtitle; or

(iii) a declaratory ruling of the unit as to a regulation, order, or statute, under Subtitle 3 of this title.

(3) "Regulation", as used in §§ 10–110 and 10–111.1, means all or any portion of a regulation.

2. The Developmental Disabilities Administration has since promulgated regulations incorporating the measure, the imposition of a percentage limit on the increase in certain overhead costs allowed all PPS providers, *i.e.* a "growth cap." See Notice of Emergency Action, 22 Md. Reg. 1654 (1995). DDA concedes that, prior to taking this action, it had not followed the formal rulemaking procedures prescribed by the APA.

3. Focusing on the purpose for the enactment of the APA, the majority notes that the Commission on Administrative Organization of the State commented that it was intended to "ensure that 'certain basic principles of common sense, justice and fairness,' including notice to interested parties, are applied in administrative proceedings 'without unduly restricting the agencies in the performance of their various tasks.'" 343 Md. 336, 338, 681 A.2d 484, 485 (1996) (quoting the Commission's Seventh Report 8 (1952)). As the majority sees it, therefore, what has to be achieved in this case is the balance that was intended when the APA was adopted: the State's interest in efficient operation and the interested party's interest in fairness.

4. The regulations establishing the PPS are codified at Code of Maryland Administrative Regulations (COMAR) 10.22.17. Those regulations,

1995 Repl.Vol., 1995 Cum.Supp.) §§ 7–205[5] and 7–234(a)[6] of the State Finance & Procurement Article, against State agencies exceeding their budget appropriations; and the fact that DDA, in the past, without protest or challenge, had instituted other cost containment measures.[7] In support of its conclusion that the "growth cap" rather than change existing law, simply effectuates existing policy, the majority asserts that one of the properly promulgated regulations, COMAR 10.22.17.08.A, contemplates "establishing limits on the percentage of the prospective payment rate for any cost center."

---

which incorporate by reference the "Prospective Payment System for Community Services to the Mentally Retarded and Developmentally Disabled Clients Procedures Manual (First Edition)," provide that PPS " is subject to the budget appropriations approved by the Legislature" and that

The Department may take cost containment measures to control total expenditures on the prospective payment system. These cost containment measures may include, but are not limited to:

(1) Sharing in any surplus on prospective payments less actual cost;

(2) Establishing limits on the percentage of the prospective payment rate for any cost center.

COMAR 10.22.17.08.A. The manual echoes that regulation, stating that "[o]ther cost containment measures for budgetary control may be necessary."

**5.** § 7–205. *Disbursements in accordance with current appropriation.*

Money may be disbursed from the State Treasury only in accordance with the current appropriation for a program as amended from time to time in accordance with this title.

**6.** § 7–234. *Expenditures in excess of appropriation.*

(a) Prohibited.—An officer or unit of the State government may not spend money:

(1) in excess of the total appropriation to the officer or unit; or

(2) in excess of the amounts set forth in the current schedule for apportionment and disbursement of the appropriation.

**7.** It appears that these "cost containment measures" were instituted as early as fiscal year 1990 and were continued in each successive year thereafter, until the appellee challenged this most recent measure. That the providers may have acquiesced in these past cost containment measures, waiving their arguments under the APA, does not estop them to challenge the failure of DDA formally to adopt this regulation. To me, this is common sense. The majority has not explained or provided any authority for holding otherwise.

I gather from the foregoing that the majority does not view the "growth cap" as a regulation within the contemplation of APA § 10–101(g). The majority also seems to be saying that this particular cost containment measure is covered by the properly promulgated existing regulations and, in any event, it strikes the proper balance of being fair to the appellee and giving the agency the flexibility it needs to maintain an efficient operation. I am not persuaded. In fact, I find the reasoning of the Circuit Court for Baltimore County (Kahl, J.) to be compelling. Accordingly, I dissent.

The appellant argued before the circuit court, as it has before this court, that the "growth cap" is not of widespread applicability. The circuit court rejected that argument, I think properly, relying on opinions of the Attorney General addressing that very point. I adopt its analysis:

> The two best analyses of the notion of "general application" in Maryland are found in 72 *Op. Att'y Gen.* 230 (July 8, 1987) and 75 *Op. Att'y Gen.* 15 (Jan. 23, 1990). Both opinions suggest that the term "regulation" has consistently been, and should be, construed "as broadly as its language and apparent underlying intent direct." 75 *Op. Att'y Gen.* 15, 22 (quoting 72 Op. Att'y Gen. 230, 233). Accordingly, it would seem that any doubt should be resolved by finding the policy to be one of "general application".... The Attorney General has also set forth in 72 *Op. Att'y Gen.* 230, n. 4, which DDA has relied upon in support of its contention that policies aimed at those in contractual relations with the agency in question are ordinarily not of "general application." The Attorney General stated:
>
>> In 72 *Opinions of the Attorney General* 230, 234 n. 4 (1987) we suggested that when "a group of persons in a contractual relationship with a State agency [are] affected by agency directives authorized under the contract," those directives might not be of "general application" and hence might be outside the definition of "regulation" in the APA. That suggestion, however, did not have in mind directives under a complex program like Medicaid, having effects on a large group of providers and, potentially on

program beneficiaries as well. Thus, the better approach is to view Transmittal No. 91 as of "general applicability" and then analyze its effects in considering whether the internal management exception applies to it.

75 *Op. Att'y Gen.* 15, 24 n. 9.

Admittedly the PPS program is not as broad as Medicaid and covers, to date, only 93 providers, however the number of program beneficiaries to be impacted by the 1994 cost containment policy is potentially enormous. Accordingly, this Court adopts the rationale of the Attorney General set forth above.

The Attorney General has also opined that "[e]ven though an action applies to persons within a small class, the action is of general application if that class is described in general terms and new members can be added to the class." 72 *Op. Att'y Gen.* 230, 234 n. 4 (quoting *Citizens for Sensible Zoning v. Dept. of Natural Resources,* 90 Wis.2d 804, 280 N.W.2d 702, 707–708 (1979). As asserted by Chimes, the 1994 cost containment policy applies to all DDA providers, a class described in general terms. In addition, new members can join that class by executing provider agreements with DDA and providing services for a period sufficient to allow for calculation of historic costs.... Thus it appears the policy is, indeed, one of "general Application" within the definition of SG 10–101(1)(e)(i), regardless of how this Court chooses to address that issue.

The circuit court also properly rejected the appellant's argument, premised on the cost containment measure being merely reflective of existing regulations and, hence, simply effectuates the policy expressed therein. It relied on this Court's opinion in *Insurance Comm'r. v. Bankers Independent Insurance Company,* 326 Md. 617, 624, 606 A.2d 1072, 1075 (1992). In that case, Chief Judge Murphy, the author of the majority opinion in this case, speaking for the Court, observed:

[A] legislatively delegated power to make rules and regulations is administrative in nature, and it is not and can not be

the power to make laws; it is only the power to adopt regulations to carry into effect the will of the legislature as expressed by the statute. Legislation may not be enacted by an administrative agency under the guise of its exercise of the power to make rules and regulations by issuing a rule or regulation which is inconsistent or out of harmony with, or which alters, adds to, extends or enlarges, subverts, impairs, limits, or restricts the act being administered.

*Id.*

I note, at the outset, that the circuit court is absolutely correct—COMAR 10.22.17.08.A, upon which the appellant relies as authorizing it to proceed as it did and thus permits it to argue that the subject regulation is not a regulation at all, does not pass muster under *Bankers*. More fundamentally, I also agree with the circuit court that the subject "growth cap," whatever the majority's characterization, is a regulation within the definition set forth in § 10–101(g).

The majority states that the "growth cap" is not the statement of a new policy and that it did not change existing policy. The majority misspeaks. A form of reimbursement that requires the payment of all expenses incurred by the provider in supplying the services overseen by the agency is significantly different from one that recognizes, for reimbursement purposes, only some of those expenses. The moment the agency issues a directive adopting the new formula, that draws the distinction, it has stated a new policy and it certainly has significantly altered the old one. The only similarity between the two policies is that they both are reimbursement methods.

Prior to issuing the regulation which is the subject of this case, the DDA regulations required the DDA to reimburse the PPS provider based on the reports they submitted, adjusting for inflation and attendance rates. See COMAR 10.22.17.06 and Manual at 800–9. After the regulation, reimbursement was based on the provider reports and a "growth cap" imposed by the agency. Contrary to the majority, I consider the difference quite significant. Moreover, I am hard-pressed to

find its authorization in the formally adopted regulations. There really is a difference between saying that certain measures may have to be taken in the future and, when the circumstances requiring the taking of the measures have occurred, formulating the precise responsive measures.

The APA prescribes the formal process, in accordance with which regulations must be promulgated and adopted. *See* APA §§ 10–109–117.[8] It would indeed be a subversion of the purpose and intent of this aspect of the APA if, as Judge Kahl pointed out, an administrative agency were enabled to "sidestep [these] requirement[s] merely by allowing for implementation of 'regulations' by administrative fiat." But that is precisely the effect of the appellant's theory, adopted by the majority: a statement of agency policy otherwise meeting the definition of "regulation" somehow is rendered not a regulation by virtue of the agency having previously adopted a broad, open-ended rule contemplating future action by the agency. But a "regulation" is no less a "regulation" simply because a previous regulation has been drafted so as to recognize, if not anticipate, that, sometime in the future, it may be necessary to adopt other, different policies than those presently reflected in the formally adopted regulations, to

---

**8.** Maryland Code (1982, 1994 Repl.Vol., 1995 Cum. Supp) § 2–104 of the Health General Article, which authorizes the Secretary of Health and Mental Hygiene to promulgate rules and regulations, seems also to contemplate, and, so, favors, formal rule-making. It provides:

    (b) Rules and regulations.-

      (1) The Secretary may adopt rules and regulations to carry out the provisions of law that are within the jurisdiction of the Secretary. (2) (i) The Secretary shall adopt regulations, in consultation and cooperation with local governing bodies, to govern the siting of community residences for special populations funded by the Department, the Department of Housing and Community Development, the Department of Human Resources, and the Department of Juvenile Justice.

      (ii) Any regulations adopted shall comply with the Federal Fair Housing Amendment Act of 1988.

      (iii) Prior to the adoption of any regulations proposed under this subsection, the Secretary shall conduct a public hearing for the sole purpose of allowing all the governing bodies of each county and municipality the opportunity to review and comment on the proposed regulations.

include those that are the subject of the "regulation" at issue. And because it is a regulation and remains one despite the reference in the existing regulation, it too must be promulgated with the required formality. Anticipating the need for the policies such a regulation would effectuate in advance of the need for their implementation provides no basis for the informal rule-making that occurred in this case.

If the majority is correct, the benefits of formal rule-making will be significantly undermined. No longer will amendments to regulations to take account of changed circumstances be necessary. Each agency can be expected to include in the regulations it promulgates language indicating that it may be necessary for the agency to take future action of a general nature to address changed circumstances. Under this opinion, that would be all that is required to permit the agency to issue detailed directives, informed by the facts as they have developed, which significantly changes the policies announced by the original regulations. The fairness intended for the interested parties will be largely lost. At the same time, the very real potential for administrative agencies to abuse their power will concomitantly increase and at the expense of the very parties to whom the APA was intended to be fair. As the appellee puts it:

> Such a regulatory short-cut completely undermines the APA's goal of ensuring fairness and efficiency by allowing regulated populations who may be significantly affected by the proposed agency policy to participate in the rulemaking process.

In short, taking the majority's approach skews the balance and it does it precipitously.

Neither time, expense, nor the need for flexibility warrants this result. When a regulation is required by the Legislature to be formally promulgated, it must be formally promulgated, notwithstanding the expense, the time involved, or the lack of flexibility that entails. *Fraternal Order of Police, Montgomery County Lodge 35 et al. v. Mehrling,* 343 Md. 155, 172–79,

680 A.2d 1052, 1061–65 (1996). Expediency simply should not be allowed to hold sway over the regular and rightful process to which an interested party is entitled.

In any event, I am not convinced that requiring the DDA to follow the proper procedure for adopting regulations is so time-consuming or costly as to warrant its avoidance. The emergency rule-making procedures, which, according to the majority, are also too burdensome, are, in fact, intended and designed to take account of, and accommodate, the need for the agency to act quickly and with dispatch, thus giving it the needed flexibility. At the very least, the agency should be required to follow those procedures whenever it desires to change, expand or clarify the regulations pursuant to which it and the providers under the program it administers are working. To the majority, however, it appears that nothing short of complete authority informally to make rules will suffice. It, like the agency would completely abrogate the APA's requirement that amendments to existing regulations be adopted with the same formality that accompanied the original regulation. That approach renders nugatory the portion of § 10–101(g) that prescribes that requirement, contrary to the usual rules of statutory construction. *See Prince George's County v. Vieira,* 340 Md. 651, 658, 667 A.2d 898, 901 (1995) (quoting *GEICO v. Insurance Comm'r,* 332 Md. 124, 132, 630 A.2d 713, 714 (1993)); *Rose v. Fox Pool Corp.,* 335 Md. 351, 359, 643 A.2d 906, 910 (1994); *Montgomery County v. Buckman,* 333 Md. 516, 524–25, 636 A.2d 448, 452 (1994); *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753, 758 (1993).