Dear Honorable Chris Van Hollen, Jr.
You have requested our opinion concerning a recent Policy Statement issued by the Subcabinet for Children, Youth, and Families that establishes a strict two-year limit on services provided to an eligible child under the State's "Return/Diversion" initiative.
Specifically, you asked whether the Policy Statement fits the definition of "regulation" in the State Administrative Procedure Act ("APA") and should be adopted under the rulemaking provisions of the APA in order to be enforceable. You also asked whether a policy that sets such a time limit adversely discriminates against children with the most significant needs and disabilities.
In our opinion, the limit on duration of services established by the Policy Statement should be adopted in accordance with the APA. However, were it adopted under the APA, such a policy would not be discriminatory on its face.
 I Background
A. The Return/Diversion Initiative
"Return/Diversion" is the label now applied to State efforts since the early 1990s to avoid placing children with special needs outside Maryland. The Return/Diversion strategy targets children who are in, or at risk of, an out-of-State placement. It attempts to provide those children with appropriate services within Maryland) in the child's home, a local group home, or day school program.[1]
B. Development of Return/Diversion
1. Creation of the Subcabinet
The Return/Diversion strategy was one of the original charges of the Subcabinet for Children, Youth, and Families ("the Subcabinet"). The Subcabinet, comprised of the heads of Maryland's child-serving agencies, was created by executive order in 1989. COMAR 01.01.1989.12. Under the executive order, the Subcabinet was made responsible for improving services to the State's children and, in particular, for establishing a coordinated, interagency system of these services. Id. Among other things, it was directed to develop "a plan for eliminating or significantly reducing the out-of-State placement of children in special education and therapeutic residential service programs." COMAR01.01.1989.12C(2)(e).
The General Assembly codified the Subcabinet in statute in 1993. Chapter 556, Laws of Maryland 1993, codified in Annotated Code of Maryland, Article 49D, § 4.1. The Office of Children, Youth, and Families ("OCYF") provides staff support for the Subcabinet. Id.
2. Early Development of Strategy
A 1991 report by the State Coordinating Council for Residential Placement of Handicapped Children[2] reported that there were 719 children in out-of-state placements, an increase from 545 placements three years earlier. State Coordinating Council for Residential Placement of Handicapped Children, Annual Report: July 1, 1990 — June 30, 1991 at p. 3. The report indicated that the average length of stay for children in out-of-state placements was approximately two years. Id. at p. 7. Children who were placed out-of-state required treatment for various reasons, including affective disorders (i.e., dysthymia, major depression, bipolar disorder), attention deficit disorder, various levels of mental retardation, and conduct disorder. Id. at p. 18.
Against that background, the Subcabinet adopted a policy that, whenever possible, children should be diverted from out-of-state placements and placed into appropriate, family-focused, community-based alternatives. Id. at pp. 5-6. As part of the initiative, participating agencies analyzed resource needs, established a licensing policy board to streamline licensing regulations, encouraged the development of "local governing boards" in each county to develop plans for reducing out-of-home placements,[3] and highlighted budgetary language that authorized "flexible funding") i.e., the use of agency residential placement funds for less restrictive alternatives.[4] Id.
3. 1992 Legislation
The General Assembly incorporated the Return/Diversion strategy in statute in 1992, declaring that it is the policy of the State to "prevent the unnecessary placement of children with special needs in out-of-state institutions." Chapter 264, Laws of Maryland 1992, now codified at Annotated Code of Maryland, Article 49D, § 20.1(a).[5] The statute mandated that OCYF, in collaboration with a committee of agency heads and after consultation with other interested parties, develop "a plan for returning children with special needs in [then] current out-of-state placements to Maryland and preventing future out-of-state placements." Article 49D, § 20.1(b)(1).
The plan was to have a goal of returning children with special needs who had been placed out-of-state by July 1, 1997, subject to limited exceptions. Article 49D, § 20.1(b)(2).
The plan was also to spell out the means by which the State and local planning agencies would develop the required range and quality of services, flexible funding strategies and resources for the development of the broad range of required services, and the amount and sources of necessary funds. Article 49D, § 20.1(b)(3). The various agencies responsible for serving these children would have flexibility in accordance with the plan to use funds available for out-of-home care for less restrictive care. Article 49D, § 20.1(d).
The statute did not set a limit on the duration of services to be provided to a child under the Return/Diversion strategy. However, there is some evidence in the legislative file that the General Assembly may have contemplated that such services would last approximately two years. At the hearing on the cross-filed bill in the House of Delegates, the Special Secretary for Children, Youth, and Families testified that the average out-of-state placement was two and one-half years in duration. Summary of testimony at hearing on House Bill 1325 (1992). In addition, the fiscal note for the legislation supporting the Return/Diversion strategy stated:
 Under the current policy of [OCYF] any savings realized as a result of returning children from out-of-state placements would be used as incentives for the development of in-state community based services; these incentives are intended to continue for a 2 year period.
Revised Fiscal Note on SB 588 (1992). This time line appears related to the understanding that out-of-state placements averaged approximately two years in duration.
The Legislature directed OCYF to adopt regulations necessary to carry out the statute.
Article 49D, § 20.1(e)(1). The regulations were to include schedules for returning children from out-of-state placements, schedules for the prevention of out-of-state placements, and any allowable exceptions. Article 49D, § 20.1(e)(2).[6]
4. Legislative Direction to Implement Plan
At the beginning of the 1993 legislative session, OCYF submitted the plan required by the 1992 legislation. Maryland's Return from Out-of-State Plan (Senate Bill 588) January 1993 ("SB 588 Plan"). The SB 588 Plan identified a series of issues that would need to be addressed to accomplish the goal of returning children placed out-of-state and avoiding new out-of-state placements.
The plan assessed the needs of children at risk of residential placement, existing resources in the State to meet those needs, and major gaps in services. SB 588 Plan at pp.
6-25. The plan also made recommendations to develop community-based resources for children with special needs, including changes to licensing and rate-setting for providers, creation of comprehensive, interagency information and case management systems, and increased training and technical assistance for agency personnel, service providers, and families and their advocates. Id.
The SB 588 Plan listed four principles as the foundation for the Return/Diversion strategy. They were:
 (1) flexible funding to "support local authority and promote an interagency, non-categorical approach";
 (2) refinancing mechanisms to "maximize access to federal revenues . . .while supporting the concept of providing care in the least restrictive, appropriate and safe setting";
 (3) maintenance of state effort, such that "monies saved through effective refinancing efforts and flexible funding should be available for reinvestment in building resource capacity and in providing incentives to local jurisdictions for local development and/or enhancement of services and programs";
 (4) funding capital initiatives for children's services in a manner "coordinated across agencies and between the public and private sectors."
SB 588 Plan at 27-29. Based on these principles, the SB 588 Plan made numerous fiscal recommendations. Id. Finally, the SB 588 Plan outlined a set of "local implementation procedures" which would serve as a prototype for the Return/Diversion strategy. The plan did not set forth a specific limit on the duration of Return/Diversion services for an individual child.
In legislation enacted later that year, the General Assembly directed that the Special Secretary for Children, Youth, and Families, together with the heads of the appropriate State agencies implement the plan. Chapter 556, Laws of Maryland 1993, now codified in pertinent part at Article 49D, § 20.1(f).
B. Implementation of Return/Diversion Strategy
1. Local Entities
The Return/Diversion strategy is implemented locally through two entities known as the Local Coordinating Council ("LCC") and the Local Management Board ("LMB").
Under State law, there is an LCC in each county and Baltimore City comprised of representatives of various State and local agencies involved in providing services to children.
Article 49D, § 16(1), 17, 18. The LCC is charged generally with providing an interagency plan of care for children with disabilities in need of residential placement. Article 49D, § 19.
Because of its responsibilities for residential placement of children with disabilities, the LCC has a key role in the Return/Diversion strategy.
Each local jurisdiction also has a local management board ("LMB") to "ensure the implementation of a local interagency service delivery system for children, youth, and families." Article 49D, § 11. An LMB may be an agency of the local government, a quasi-public nonprofit corporation that is not considered an instrumentality of the local government, or a regional nonprofit corporation or public agency representing multiple jurisdictions. Article 49D, § 11(b).
2. Grant Agreements
The LMB administers the program in accordance with the Local Management Board Policies and Procedures Manual, a publication issued by OCYF with the approval of the Subcabinet. The LMB enters into a grant agreement with the Subcabinet, now drafted as a 5-year agreement called a "Partnership Agreement." Among other things, the grant agreement governs the allocation of Return/Diversion funds to the LMB. As part of the agreement, the LMB agrees to abide by federal and State law and regulations and by the LMB Manual, which is incorporated by reference in the agreement. The LMB also agrees to incorporate the LMB Manual into its subcontracts with providers. The Subcabinet thus governs the administration of Return/Diversion services through policies and procedures set forth in the Manual, which thereby become part of the agreements with the LMBs and ultimately with providers.[7]
3. Process
The Return/Diversion process starts when an agency that is represented on the LCC[8] requests that the LCC consider a child for Return/Diversion services. Such a child would ordinarily be entitled to services through the "lead agency" that brings the case to the attention of the LCC; however, those services may require residential treatment that is available only outside of Maryland. If the LCC determines that the child is an appropriate candidate for Return/Diversion services, it refers the matter to the LMB.
Once the case is referred to the LMB, a service provider under contract with the LMB determines whether a plan of care can be developed through Return/Diversion that addresses the specific needs of the child. The plan may include entitlement services, as well as additional services targeted to the needs of the child.
If the LMB approves the child for Return/Diversion services, the LMB assumes responsibility for the delivery of services under the Return/Diversion strategy. The LMB contracts with providers who perform case management services, receives State funding, and reimburses the service providers.
4. Funding
The State provides financial support to the LMBs for Return/Diversion services through the Subcabinet Fund ("the Fund").[9]
Article 49D, § 4.3. The Fund also provides financial support for other initiatives related to children at risk, such as family preservation.[10]
Maryland FY 2003 Budget at III-105.
For each child currently served through the Return/Diversion strategy, the State provides the LMB with a sum of money based on the average annual cost of an out-of-state placement for a period of up to two years. This rate, referred to as a "financial backpack," is recalculated periodically to reflect current costs for out-of-state placements. If an LMB can serve a child within the State for less than the "backpack" amount, then the LMB may retain a portion of the excess amount and "reinvest" those funds in community-based services deemed necessary through a local needs assessment process. See Article 49, § 4.3(4) (authorizing Subcabinet to use "fiscal incentives to encourage more productive use of State funds"); § 4.2(d) (State's share of incentives earned under LMB agreement to be paid to special fund).
Thus, the funding for Return/Diversion services has been computed on the assumption that services will be provided for up to two years. While the two-year time frame appears based on the past experience reported to the Legislature and cited in the Fiscal Note to the Return/Diversion legislation, nothing in the SB 588 Plan or the statute itself indicates that the duration of Return/Diversion services is limited to two years.
While the funding of Return/Diversion services has been calculated on the basis of a two-year time frame, the 1998 version of the LMB Manual issued by OCYF stated that extensions of Return/Diversion services beyond two years were "possible," to pay for actual costs of services, if extensions were agreed upon by the LMB, the LCC, and the child's local lead agency. 1998 LMB Manual, Section III, p. 25 (October 30, 1998).
5. Return/Diversion Regulations
Until recently, OCYF had not issued regulations implementing the plan developed as a result of the 1992 legislation. Last year, the agency adopted regulations addressing, among other matters, the roles and responsibilities of the State Coordinating Council and LCCs, and procedures for out-of-state placements. However, the regulations do not specifically address the availability of services under the Return/Diversion program. See 28:17 Md. Reg. 1552 (August 24, 2001), codified at COMAR 01.04.01.
C. Experience under Return/Diversion
The Return/Diversion initiative has been deemed a success. As a result of the Return/Diversion strategy, the number of children in out-of-state placements was reduced from more than 800 in 1992 to approximately 100 in 2000. However, among the children receiving Return/Diversion services within the State, OCYF noted a pattern. Of the nearly 200 children receiving services at the end of Fiscal Year 2001, 92 were doing so under extensions of the two-year limit. A single jurisdiction accounted for nearly half the children served under extensions. Of the 92 children receiving services for more than 2 years, 45 resided in Montgomery County. For 37 of those children, the local school system was the referring agency. "Return/Diversion-FY 2001: Children in Service More than Two Years," Office of Children Youth and Families Data Sheet.
The Subcabinet became concerned that indefinite provision of Return/Diversion services could not be sustained under current funding levels. The Subcabinet also was concerned that an indefinite term of services for some children would preclude new children from receiving the benefit of the Return/Diversion program and thereby frustrate the original purpose of the strategy. Thus, the Subcabinet issued policy statements to enforce a strict two-year limit and to eliminate extensions.
D. 2001 Policy Statements
During 2001, the Subcabinet issued two policy statements concerning the Return/Diversion program. First, on May 14, 2001, the Subcabinet issued "Policy Statement FY 2001 — #1." That document briefly recounted the purpose and history of the Return/Diversion initiative and stated that "[i]mplicit in the funding projection for [Return/Diversion] services was the expectation that this service would last no more than two years. This service is not an entitlement." (emphasis in original). The policy statement explained:
 It is expected that the intensity of services needed will decrease after two years, because the child will have benefitted from the in-state, flexibly-funded services provided and the child will be able to transition into less intensive, publicly-funded state services available to the eligible child, through their lead agency.
The policy statement also emphasized that a child must be eligible for residential services from a child-serving agency as a prerequisite to Return/Diversion services. The policy statement concluded that, effective May 14, 2001, any new case accepted for Return/Diversion services would result in services limited to a maximum of two years. The policy statement further directed that transition plans be developed for children currently receiving services, including those already beyond the two-year limit.
The second policy statement, entitled "Policy Statement FY 2002 — #1," was issued on July 1, 2001. It set forth time lines and procedures for transition of children in cases beyond the two-year limit. These transition plans were to define those services for which the child would remain eligible from one or more agencies. The policy statement directed that the transition plans be completed by September 30, 2001 and fully implemented by July 1, 2002.[11]
These policy statements have been incorporated in the most recent edition of OCYF's manual for LMBs. See Local Management Board Policies 
Procedures Manual (July 30, 2001), Section III, pp. 7-8, 14; see also Section III, p. 9 (addressing maximum length of services). Neither policy statement has been adopted as a regulation under the State Administrative Procedure Act.
 II Rulemaking
You have asked whether the strict two-year limit in Policy Statement FY 2001-#1 is a "regulation" that must be adopted under the State Administrative Procedure Act ("APA") in order to be enforceable.
A. Required Rulemaking under the APA
The definition of "regulation" under the APA is broadly worded. It provides, in part:
 (1) "Regulation" means a statement or an amendment or repeal of a statement that:
(i) has general application;
(ii) has future effect;
(iii) is adopted by a unit to:
1. detail or carry out a law that the unit administers;
2. govern organization of the unit;
3. govern the procedure of the unit; or
4. govern practice before the unit; and
(iv) is in any form, including:
1. a guideline;
2. a rule;
3. a standard;
4. a statement of interpretation; or
5. a statement of policy.
(2) Regulation" does not include:
(i) a statement that:
1. concerns only internal management of the unit; and
 2. does not affect directly the rights of the public or the procedures available to the public; . . .
Annotated Code of Maryland, State Government Article ("SG"), § 10-101(g). Subject to limited statutory exceptions, the rulemaking procedures of the APA apply to each unit in the Executive Branch of State Government. SG § 10-102.
The APA prescribes detailed procedures for adopting a regulation. For example, an agency must publish a proposed regulation in the Maryland Register. The agency must also provide an opportunity for public comment, by either scheduling a hearing at which "oral or written views and information may be submitted," or by "giving a telephone number that a person may call to comment and an address to which a person may send comments." SG § 10-112(a)(3)(ii).[12] "The APA is intended to ensure that the affected members of the public will have a chance to comment . . ." 79 Opinions of the Attorney General 354, 360 (1994). These procedures are designed to enhance the fairness of the rulemaking process. CBS, Inc. v. Comptroller of the Treasury, 319 Md. 687,695, 575 A.2d 324 (1990). If the agency fails to comply with the procedural requirements, a policy that must be expressed in a regulation will be unenforceable. SG § 10-125(d)(3).
Of course, not every agency action must be implemented through the rulemaking process, even if it technically fits the APA definition of "regulation." Maryland Association of Health Maintenance Organizations v. Health Services Cost Review Commission, 356 Md. 581, 600, 741 A.2d 483
(1999). For example, in appropriate circumstances, an agency may proceed by adjudication rather than rulemaking. See, e.g., Baltimore Gas 
Electric Co. v. Public Service Commission, 305 Md. 145, 168, 501 A.2d 1307
(1986); Consumer Protection Division v. Consumer Pub. Co., 304 Md. 731,755, 501 A.2d 48 (1985).
The APA itself also specifically excludes from the definition of "regulation" a policy that concerns "only internal management" of the unit, provided that the policy "does not affect directly the rights of the public" SG § 10-101(g)(2)(i). In applying the internal management exception, a distinction is made between directives that have little direct effect on the public, and those that have a direct, substantial effect. See, e.g., 72 Opinions of the Attorney General 230 (APA rulemaking not required for agency smoking guidelines that implemented executive order, when guidelines affected the public only indirectly or incidently). The exception applies only if the internal guidance does not significantly affect either the procedural steps that affected persons must take in their dealings with the agency or the allocation of substantive benefits and burdens. Id. at 235-36. Policies establishing program eligibility criteria not set forth in statute, restricting access to a statutory benefit, or imposing fees generally do not fall within this exception. Id.; see also 75 Opinions of the Attorney General 37, 51-55 (1990).
In CBS, Inc. v. Comptroller, 319 Md. 687, 575 A.2d 324 (1990), the Court of Appeals considered whether rulemaking was required before the Comptroller could employ a new computation method as part of a corporate income tax audit. During that audit, the Comptroller for the first time insisted on application of a particular method for allocating a national company's revenue among the states in which it operated. As a result, the company's Maryland taxes increased significantly for the years in question.
When the company challenged use of the new method, the Court of Appeals held that the Comptroller was required to adopt the new policy by regulation under the APA. The Court noted that the Comptroller had previously used another method of computation and that this other method appeared consistent with an existing regulation; the Court "inferred" that the other method was the established policy of the Comptroller.319 Md. at 697. The Court acknowledged that agencies have broad discretion to proceed by adjudication rather than rulemaking, and it declined to "make an all encompassing statement" of the circumstances under which rulemaking would be required. However, the Court noted that a New Jersey case involving virtually identical facts had concluded that rulemaking is mandatory when an agency determination is intended as a general standard, deals with broad policy issues, and effects a material change in existing law. Id. at 695 (citing Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 478 A.2d 742 (1984)). The Court adopted that approach and concluded "that when a policy of general application, embodied in or represented by a rule, is changed to a different policy of general application, the change must be accomplished by rulemaking." Id at 697.
The Court of Appeals has distinguished CBS in two cases in which it held that state agencies could use financial formulas affecting certain State contractors and regulated entities without adopting the formulas by regulation. See Maryland Ass'n of Health Maintenance Org. v. Health Serv. Cost Review Comm'n, 356 Md. 581, 741 A.2d 483 (1999) ("MAHMO"); Department of Health and Mental Hygiene v. Chimes, 343 Md. 336,681 A.2d 484 (1996) ("Chimes").
In Chimes, the Developmental Disabilities Administration ("DDA"), which was responsible for developing a State plan to provide services to persons with developmental disabilities, contracted with various private entities to furnish those services. It established by regulation a Prospective Payment System ("PPS") for the payment of service providers.
Consistent with the statutory prohibition on agencies spending money in excess of budget allocations, those regulations provided that PPS was "subject to the budget appropriations." The regulations also stated generally that DDA could institute "cost containment measures," and provided two examples of how such measures could be implemented. The agency instituted cost containment measures by several methods over the years.
When the agency imposed a "growth cap" according to a particular formula, reimbursements were reduced to Chimes, one of the private entities under contract with DDA. Chimes challenged the implementation of the growth cap on the ground that the agency had not embodied the growth cap in a regulation adopted under the APA. DDA asserted that application of the growth cap effected no change in existing law, but merely applied the existing regulation that generally notified providers that the agency could impose "cost containment measures." 343 Md. at 344.
The Court of Appeals held that the agency did not violate the APA. The Court distinguished CBS on the basis that "DDA did not formulate new rules of widespread application, change existing law, or apply new standards retroactively to the detriment of an entity that had relied upon the agency's past pronouncements." 343 Md. at 346. The Court also noted that the growth cap applied to a limited number of providers, whose contracts were subject to termination by either side. In addition, the growth cap applied "only in a particular program, in a particular year, and in response to a particular budget crisis." Id. Finally, the Court recognized the time constraints on the agency's effort to implement cost containment and its employment of a process that addressed issues of fairness — i.e., notifying and discussing the growth cap with providers prior to implementation. 343 Md. at 347. The Court concluded that the growth cap "was not a `regulation' in the sense contemplated by the APA" and therefore did not have to be adopted according to APA rulemaking procedures. 343 Md. at 348.
MAHMO involved a challenge to the use of a formula called the Inflation Adjustment System ("IAS") by the Health Services Cost Review Commission ("HSCRC"). Without adopting IAS through rulemaking, the HSCRC used IAS for two purposes: to adjust hospital rates in an "administratively practical manner" without a full rate review to reflect changes that had occurred since the hospital's previous full rate review, and to provide incentives for hospitals to perform more efficiently. 356 Md. at 586. A rate review under IAS was not binding on a hospital; the hospital retained the right to request a full rate review. 356 Md. at 586-87,591.
An association of health maintenance organizations challenged the use of IAS on several grounds, including that HSCRC violated the APA by not adopting IAS as a regulation. The Court distinguished CBS on the ground that the IAS did not represent a change in policies or standards; nor was it applied retroactively to the detriment of regulated hospitals. Rather, "[t]he IAS is simply a methodology, long in use, to effectuate the law. It reflects policies set forth by the General Assembly. It is the starting point from which the Commission proceeds case-by-case in order to take into account the individualized costs and needs of the particular hospital. As such, formal rulemaking is not required as it was in CBS." 356 Md. at 602.
B. Application of APA to Policy Statements on Return/Diversion
The strict two-year limit in Policy Statement FY 2001) #1 is a statement of policy of "general application" to a segment of the State's population — children with special needs vulnerable to out-of-state placement. It has "future effect" and was adopted to carry out a law that the Subcabinet and OCYF administer. Thus, it appears to fall squarely within the definition of "regulation" in the APA. Moreover, the Policy Statement has the effect of changing a policy of general application, deals with broad policy issues, is intended to be applied as a general standard, and effects a material change in an existing policy that permits extensions beyond two years. Under the reasoning of the CBS case, APA rulemaking was required. See 78 Opinions of the Attorney General 8 (1993) (requirement in interagency agreement that made employment a prerequisite to services for students with developmental disabilities could not be given effect unless adopted through APA rulemaking).
The Court of Appeals' decisions in Chimes and MAHMO do not require a different conclusion. Unlike the growth cap in Chimes, the prohibition on extensions in Policy Statement FY 2001) #1 was not authorized by statute or by an existing regulation. Nor is the strict limit on the duration of Return/Diversion services comparable to the IAS formula at issue in MAHMO, which the Court of Appeals viewed as "simply a methodology, . . . a starting point from which the Commission proceeds case-by-case . . ."356 Md. at 602. Rather, it constitutes a "prospective exercise in policy-making that will have a significant impact" on children the program serves. 78 Opinions of the Attorney General 8, 16 (1993). Thus, regulations should have been adopted in accordance with the APA.[13]
The fact that services provided under the Return/Diversion initiative are not an entitlement (and, indeed, that the initiative itself was considered experimental) would not excuse compliance with the APA. Even experimental pronouncements of policy having the potential to effect permanent change may require APA rulemaking. See, e.g., 65 Opinions of the Attorney General 396, 405-6 (1980); 72 Opinions of the Attorney General 313, 320 (1987); 78 Opinions of the Attorney General 8, 17 (1993). Of course, many policies or procedures governing the Return/Diversion strategy that involve the relationship between the State and LMBs will have minimal impact on the public and thus fall within the APA internal management exception. See 75 Opinions of the Attorney General 37 (1990). However, the imposition of a firm two-year limit, without possibility of waiver directly impacts the population served by the Return/Diversion strategy.
Finally, regardless of whether the APA would otherwise require that a strict limit on the duration of Return/Diversion services be imposed by rulemaking, in this instance the Legislature specifically directed OCYF to adopt regulations. Article 49D, § 20.1(e)(1). In mandating regulations, the Legislature gave illustrative examples of the content of those regulations that focused on timing issues) schedules for returning children and for preventing of out-of-state placements and exceptions to the general policy. A policy that creates a timetable for availability of Return/Diversion services and eliminates the possibility of exceptions appears to be the kind of policy that the Legislature directed the agency to articulate in regulation.
In reaching the conclusion that APA rulemaking is required for a strict two-year limit, we make no judgment about the wisdom of the new policy. The agency may well have compelling reasons for eliminating extensions of the normal two-year duration of Return/Diversion services. For example, the agency may believe that application of different criteria for extensions in different jurisdictions, or disparate application of the same criteria have had the effect of skewing the use of the program to one jurisdiction and threaten its availability for eligible children in other jurisdictions. Clarification of the bases for extensions, or elimination of extensions altogether, may be a reasonable effort to provide for the fair and effective use of the Return/Diversion strategy throughout the State.
However, such a change in policy, reasonable or necessary as it may be, must be accomplished through the rulemaking process set out in the APA. That process provides a formal opportunity for the agency to provide advance notice to affected parties and to consider opposing views.[14]
 III Discriminatory Impact
You also inquired about the potential discriminatory effect of a strict two-year limit on Return/Diversion services. Specifically, you asked whether a "policy which terminates services based on an arbitrary time limit without consideration of an individual's level of need adversely discriminates against the very children most vulnerable to out-of-home placement . . . which the State seeks to protect."
In our view, the two-year limit is not discriminatory on its face. As we understand it, the Subcabinet considers enforcement of the policy essential for continuation of the program. In providing services under the Return/Diversion initiative, the availability of funding is a valid consideration and, according to the agency, was the primary factor that the policy was intended to address. In endorsing the use of the Return/Diversion strategy, the Legislature specifically recognized that fiscal considerations could limit its availability. Article 49D, § 20.1(a)(1) (policy to be developed "[t]o the extent that funds are available").
In reviewing disability discrimination claims, the courts consider costs and the equitable provision of services to the eligible population in determining whether reasonable accommodations are feasible without fundamentally altering the program in question. For example, in Olmstead v. L.C. by Zimring, 527 U.S. 581 (1999), the Supreme Court concluded that unjustified institutionalization of an individual with mental disabilities would constitute discrimination in violation of Title II of the Americans with Disabilities Act ("ADA") when the state's professionals had determined that community-based services were appropriate, the individual desired community-based services, and the placement could be reasonably accommodated. However, the Court remanded the case for evaluation of the state's "fundamental alteration" defense. It directed the district court to consider, "in view of the resources available to the state, not only the costs of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably." 525 U.S. at 597. See also Aughe v. Shalala,885 F. Supp. 1428 (W.D.Wash. 1995) (neither Rehabilitation Act, ADA, nor Equal Protection Clause required state to waive an age limit on AFDC assistance, for benefit of student with a learning disability who remained in school, when waiver could fundamentally alter program or impose undue financial burden).
Thus, in our view, a policy that limits the time a person may participate in a program is not necessarily discriminatory, even though persons who are no longer eligible might benefit from continued services. However, in the development of regulations, this is an issue that the agency might properly evaluate.
 IV Conclusion
In summary, a policy creating a firm limit on the duration of services under the Return/Diversion strategy must be adopted under the APA's rulemaking process. A policy limiting the availability of services for a fixed period due to financial limitations would not be facially discriminatory.
 J. Joseph Curran, Jr. Attorney General
 William R. Varga Assistant Attorney General
 Robert N. McDonald Chief Counsel Opinions Advice
[1] The Return/Diversion strategy is part of a broader effort, called "systems reform," to improve the way in which services are provided to children. The goals of systems reform are: (1) to encourage "comprehensive, home and community-based family-focused services"; (2) to ensure that decisions are made through "an interagency, collaborative, results-based approach that facilitates public/private partnerships"; and (3) to "decategorize" funding and redirect spending from out-of-home placement services to "flexibility for funding decisions based on outcomes." Local Management Board Policies and Procedures Manual, Section I, p. 2 (July 30, 2001).
[2] The State Coordinating Council is charged with overseeing residential placement decisions for children with disabilities. Article 49D, § 16. It is comprised of representatives of most of the agencies that are part of the Subcabinet. Article 49D, § 15. It establishes and oversees local coordinating councils in each county. Article 49D, § 16. See pp. 6-7 below.
[3] The "local governing boards" were later mandated by statute and are currently known as "local management boards." See pp. 6-9 below.
[4] For example, the Fiscal Year 1991 State budget permitted use of funds appropriated for out-of-home placements to be used for prevention of such placements and the return of children who had been placed out-of-state. Chapter 409, § 1, Items 32.12.01.12, 33.09.00.01, and 36.01.02.07, Laws of Maryland 1990.
[5] The statute states, in pertinent part:
 The General Assembly declares that it is the policy of this State:
 (1) To the extent that funds are available, to provide for and encourage the development of a continuum of quality education, treatment, and residential services for the children of this State;
(2) To serve children:
(i) In their homes; or
 (ii) In the least restrictive setting most appropriate to their individual needs;
 (3) That unless the State has determined that the individual needs of a special needs child cannot be met through additional support to the nonresidential school, home, foster home, alternative living unit, or group home, the State may not fund the placement of a child with special needs in a more restrictive setting; and
 (4) To prevent the unnecessary placement of children with special needs in out-of-state institutions.
Article 49D, § 20.1(a).
[6] A table in the legislative file that compares the Senate Bill that was enacted, a similar House Bill, and the position of OCYF indicates that the agency preferred the bill that required regulations, because it "allows the plan to be implemented without additional legislation." Legislative File for SB 588 (1992).
[7] Neither the original Return/Diversion legislation nor the SB 588 Plan mention the use of grant agreements to govern the Return/Diversion strategy. However, the Legislature acknowledged the use of grant agreements in 1994 legislation that created a special fund for "incentive" payments that became available from the reduction of costs for out-of-home placements and that were due the State under grant agreements with LMBs. Chapter 656, Laws of Maryland 1994 codified at Article 49D, § 4.2.
[8] The following agencies are represented on an LCC:
(1) The Mental Hygiene Administration;
(2) The Department of Juvenile Justice;
(3) The Developmental Disabilities Administration;
(4) The Alcohol and Drug Abuse Administration;
(5) The local board of education;
(6) The local health department;
(7) The local department of social services;
 (8) The local office of the Division of Rehabilitation Services;
(9) The local management board, and
(10) The local core service agency.
Article 49D, § 17.
[9] The General Assembly established this special fund in 1994. Chapter 735, Laws of Maryland 1994. Prior to creation of the fund, the child-serving agencies in the Subcabinet agreed to allocate a portion of their respective budgets to a pooled fund to carry out the Return/Diversion plan.
[10] Because the number of out-of-state placements has been significantly reduced since the Return/Diversion initiative began, the Fund is also now used for in-state diversions — avoiding a residential placement when the child will benefit from less restrictive care within the community.
[11] We understand that OCYF is attempting to maintain services where feasible, even for those children who have been receiving services under the Return/Diversion strategy for more than two years.
[12] The APA provides an alternative procedure for adopting an emergency regulation. SG § 10-111(b). However, in accordance with SG § 10-111(b)(4), the Joint Committee on Administrative, Executive, and Legislative Review routinely limits the duration of an emergency regulation. Therefore, agencies must ultimately adopt the regulation through the normal rulemaking process.
[13] An argument might be made that the agency could apply a presumptive two-year limit without enacting a regulation under the APA. A presumptive two-year limit appears consistent with the legislative understanding, at the time the Return/Diversion legislation was enacted, that the average out-of-State placement lasted two or two and one-half years. A presumptive two-year limit subject to extension is thus similar to the IAS formula utilized in MAHMO — i.e., a starting point reflective of policies of the General Assembly from which the LMB would proceed in a case-by-case manner.
[14] We do not address the extent to which policies included in the LMB Manual and incorporated by reference in an existing grant agreement between the Subcabinent and an LMB may remain effective during the term of that agreement. Cf. Department of Health and Mental Hygiene v. Lion's Manor Nursing Home, 281 Md. 425, 378 A.2d 1351 (1977).
 *Page 55