741 A.2d 483

**MARYLAND ASSOCIATION OF HEALTH MAINTENANCE ORGANIZATIONS, et al.**

v.

**HEALTH SERVICES COST REVIEW COMMISSION, et al.**

**No. 17, Sept. Term, 1998.**

Court of Appeals of Maryland.

Dec. 3, 1999.

582

**584**

David M. Funk (Bryan D. Bolton, Steven Jared Troy, Funk & Bolton, P.A., on brief), Baltimore, for appellants.

Maureen M. Dove, Asst. Atty. General (J. Joseph Curran, Jr., Atty. Gen.; Steven M. Sullivan, Margaret Ann Nolan, Stanley Lustman, Leslie Schulman, Asst. Attys. Gen., all on the brief), Baltimore, for appellee.

James A. Dunbar (Benjamin R. Civiletti, Peter P. Parvis, Venable, Baetjer and Howard, LLP; Jerome G. Geraghty, David L. Jacobson, Blades & Rosenfeld, P.A., all on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW *, RAKER, WILNER and CATHELL, JJ.

---

* Chasanow, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

ELDRIDGE, Judge.

The issues in this case involve the statutory authority of the Maryland Health Services Cost Review Commission. The plaintiffs-appellants, who are the Maryland Association of Health Maintenance Organizations and Deron Johnson, a member of a Health Maintenance Organization (HMO), claim that the Commission has exceeded its statutory authority in two ways: (1) by implementing the Inflation Adjustment System (IAS), and (2) by allowing excess revenue to be used toward community service programs. They also contend that the Commission violated Maryland's Administrative Procedure Act (APA) by not following APA rulemaking procedures when the IAS was implemented. The Commission argues that the plaintiffs-appellants have no standing to raise these issues.

## I.

■ The General Assembly established the Health Services Cost Review Commission in 1971. *See* Ch. 627 of the Acts of 1971, presently codified as Maryland Code (1982, 1996 Repl. Vol., 1999 Supp.), §§ 19–201 through 19–227 of the Health–General Article.[1] The Commission has "jurisdiction over the costs and rates of hospitals, health care institutions and related institutions located in Maryland." *Blue Cross v. Franklin Sq. Hosp.*, 277 Md. 93, 95, 352 A.2d 798, 800 (1976) (*Franklin Square I*). In § 19–212(5), the Commission is given the

---

1. The statutory authority for the Commission was originally codified as Code (1957, 1971 Repl.Vol., 1974 Cum.Supp.), Art. 43, §§ 568H–568Y. It was later re-codified as Code (1982, 1996 Repl.Vol.), §§ 19–201 through 19–222 of the Health–General Article, without any substantive change in the statute. *See P.G. Doctors' Hosp. v. Health Serv. Cost Rev. Comm.*, 302 Md. 193, 199 n. 1, 486 A.2d 744, 747 n. 1 (1985). After this case was filed, §§ 19–201 through 19–222 were amended by Chapters 613, 678 and 702 of the Acts of 1999, effective October 1, 1999. Although there were some substantive changes, most of the provisions relevant to this case were simply transferred from one section to another. As a result, we shall refer to the Code sections in effect as of October 1, 1999. In addition, unless otherwise indicated, all statutory references will be to the Health–General Article of the Code.

three-fold duty of assuring each purchaser of health care facility services that

"(i) The total costs of all hospital services offered by or through a facility are reasonable;

(ii) The aggregate rates of the facility are related reasonably to the aggregate costs of the facility; and

(iii) Rates are set equitably among all purchasers of services without undue discrimination."

In order to carry out this duty, the Commission is authorized to "review and approve or disapprove the reasonableness of any rate that a facility sets or requests." § 19–219(b)(1). Beginning in 1974, the Commission commenced setting hospital rates. A regulated hospital is prohibited from charging any rate not approved by the Commission. § 19–219(b)(2).

The record in this case reflects an historical account of the Commission's setting of rates. The Commission at first conducted "full rate reviews" with respect to every hospital and related institution within its jurisdiction. Under a full rate review, the Commission split the hospitals into groups based on whether they were urban or rural and then computed the actual cost per unit of service department-by-department, including "all overhead, routine, ancillary, and outpatient areas." *See also* COMAR 10.37.01.

The Commission learned, however, that completing the full rate review process for the more than 50 hospitals within its jurisdiction was burdensome. The Commission sought a new methodology that was more efficient, less administratively burdensome, and less expensive. The solution was the IAS, the purpose of which was two-fold: first, to adjust rates in a more administratively practical manner so as to reflect changes that had occurred in the hospitals since their initial full rate reviews, and second, to provide incentives for the hospitals to perform more efficiently. After the IAS was implemented, hospital rates went from 25% above the national average in 1976 to 11% below the national average in 1992. While the differential has lessened in the years since 1992, the Commission has acted accordingly, appointing the Targets

Task Force in 1995 to recalibrate the system. The Task Force, which was comprised of representatives of insurers, HMO's, hospitals, business, and labor, recommended several changes to the ratesetting system, including the addition of the System Correction Factor (SCF) to the IAS.[2] The SCF is a formula used to create a factor which is added to the IAS in order to reduce rates otherwise created under the IAS. The SCF was first applied in 1997; however, from 1992 until the implementation of the SCF, hospital rates in Maryland never exceeded 3% below the national average.

Despite the implementation of the SCF, the plaintiffs Deron Johnson and the Association argue that the use of the IAS, as a ratesetting methodology, is improper. They contend that use of the IAS exceeds the Commission's statutory authority because it is based upon "system-wide inflation factors" rather than "hospital-specific" data. (Plaintiffs' reply brief at 3).

Deron Johnson and the Association filed in the Circuit Court for Baltimore City a six-count complaint seeking a declaratory judgment, a preliminary injunction, a permanent injunction, and the issuance of a writ of mandamus. Counts 1, 3, and 4 of the complaint are at issue before this Court. Those counts alleged that the Commission had violated its statutory authority by implementing the IAS, that the Commission violated the statute by allowing excess revenue to be used toward community service programs, and that the Commission violated Maryland's APA by failing to follow APA rulemaking procedures when the IAS was first implemented.[3]

---

**2.** Deron Johnson, one of the plaintiffs in this case, was a member of the Task Force.

**3.** In count 2 it was asserted that, if the IAS and SCF were authorized by law, then the Commission would be required to implement the 1997 SCF at 3.86%. Counts 5 and 6 alleged that the due process rights of purchasers had been violated because of insufficient participation in decisions regarding the IAS and the SCF, and because the Commission had ex parte communications with hospital representatives regarding the SCF and other matters. The circuit court dismissed these three counts, and the plaintiffs have not in this Court challenged that dismissal.

When the complaint was filed, the only named defendant was the Commission. Shortly thereafter, the Maryland Hospital Association and the Maryland Hospital Coalition were permitted to intervene as defendants. The defendants filed a motion to dismiss, arguing that the plaintiffs lacked standing and that some of the issues were not ripe for decision. The plaintiffs filed a motion for summary judgment as to counts 1, 3, and 4, and the Commission filed a cross-motion for summary judgment on the same counts.

Following a hearing on the motions, the circuit court dismissed counts 2, 5, and 6 on the ground that the issues were not ripe for decision, and granted summary judgment in favor of the defendants on counts 1, 3, and 4. The plaintiffs appealed to the Court of Special Appeals, challenging the grant of summary judgment on counts 1, 3, and 4. Prior to oral argument in the Court of Special Appeals, this Court issued a writ of certiorari. *Maryland Assoc. of HMO's v. Health Services Costs*, 349 Md. 105, 707 A.2d 90 (1998).

## II.

Preliminarily, the Commission argues in this Court that neither Deron Johnson nor the Association had standing in the circuit court to raise the issues encompassed by counts 1, 3, and 4 of the complaint. The Commission asserts that Johnson has not and will not be affected differently from the general public by the Commission's action. *See Medical Waste v. Maryland Waste*, 327 Md. 596, 611 n. 9, 612 A.2d 241, 248–249 n. 9 (1992) (in order to have standing to challenge a government agency's action, ordinarily the challenger's " 'interest therein must be such that he is personally and specifically affected in a way different from that suffered by the public generally,' " quoting *Bryniarski v. Montgomery Co.*, 247 Md. 137, 144, 230 A.2d 289, 294 (1967)). *See also Sugarloaf v. Dep't of Environment*, 344 Md. 271, 288, 686 A.2d 605, 614 (1996), and cases there cited. The Commission contends that the Association lacks standing because it has no interest of its own, separate and distinct from that of its members. *See Medical Waste v. Maryland Waste, supra*, 327 Md. at 612–

613, 612 A.2d at 249 ("Under Maryland common law principles, for an organization to have standing to bring a judicial action, it must ordinarily have [an] '. . . interest of its own— separate and distinct from that of its individual members,'" quoting *Citizens Planning and Housing Ass'n v. County Executive,* 273 Md. 333, 345, 329 A.2d 681, 687–688 (1974)).

■ Section 19–227(c) of the Health–General Article of the Code, entitled "standing," provides, *inter alia,* that "[a]ny person . . . that contracts with or pays a facility for health care services has standing to participate in Commission hearings and shall be allowed" to seek judicial review of the Commission's final decisions. In *Franklin Square I,* 277 Md. at 105–106, 352 A.2d at 806, we took the position that one who pays hospital insurance premiums, with the insurer then paying the hospital, is also a "purchaser" of hospital health care services within the meaning of the statute. Deron Johnson is a member of an HMO. As such, he pre-purchases hospital services, if needed, by paying a monthly premium to his HMO. This premium is based, in part, upon rates set by the Commission. In addition, Johnson is a member of the Commission's Task Force which studies and makes recommendations to the Commission with regard to its rate-setting system. Although the present case is not a judicial review action under § 19–227(c) of the statute, nevertheless the General Assembly contemplated that persons in Johnson's position would have standing to challenge the Commission's actions. Moreover, in our view, Johnson is affected by the Commission's action in a different way than a member of the general public. Consequently, Johnson has standing to maintain this action.

■ In light of our holding that Johnson has standing, it is unnecessary for us to determine whether the Association also has standing. "Where there exists a party having standing to bring an action or take an appeal, we shall not ordinarily inquire as to whether another party on the same side also has standing." *Board v. Haberlin,* 320 Md. 399, 404, 578 A.2d 215, 217 (1990), and cases there cited. *See also, e.g., Sugarloaf v. Dep't of Environment, supra,* 344 Md. at 297, 686 A.2d at 618;

*People's Counsel v. Crown Development Corp.,* 328 Md. 303, 317, 614 A.2d 553, 559–560 (1992); *County Council v. Md. Reclamation,* 328 Md. 229, 232 n. 1, 614 A.2d 78, 80 n. 1 (1992).

### III.

■ Turning to the first issue on the merits, we hold that the use of the IAS is within the statutory authority of the Commission.

As discussed in Part I, the General Assembly gave the Commission three broad statutory duties. The Commission's mandate is to assure each purchaser of hospital services that the total costs of hospital services are reasonable, that aggregate hospital rates are related reasonably to aggregate hospital costs, and that rates are set equitably among all purchasers without undue discrimination. §§ 19–212(5), 19–219(a) of the Health–General Article. In order to carry out these duties, the Commission "may review costs and rates" (§ 19–219(a)), and "take into account objective standards of efficiency and effectiveness" when "determining the reasonableness of rates." § 19–219(b)(3). Specifically with regard to the IAS, the use of "alternate ratesetting methods" is expressly provided for under the statute. According to § 19–219(c), "the Commission may promote and approve alternate methods of rate determination and payment that are of an experimental nature," in order "to promote the most efficient and effective use of health care facility services."

The IAS, at its inception, was an alternate ratesetting method of an experimental nature adopted in order to promote the efficiency and effectiveness of both the Commission and the regulated hospitals. Within just one year of setting rates, the Commission came to the conclusion that full rate reviews were neither the most efficient nor the most effective means of setting rates. The full rate review process could take up to 6 to 8 months and could cost $50,000 to $200,000, depending upon the individual circumstances. As a result, the Commission adopted the IAS to replace, at the hospitals' option, the

time-consuming, expensive, and administratively difficult full rate reviews.

The IAS makes annual adjustments in hospital rates using the hospital's initial full rate review as a base the first year. For each subsequent year, the IAS adjustments are applied to the previous year's rate. As a result, actual hospital costs are taken into account from the very beginning. The adjustments are based upon national inflation rates in goods and services which the Commission believes to be comparable to goods and services actually utilized by Maryland hospitals. The inflation indices are category-specific: salaries and fringe benefits; food; supplies; utilities; equipment; and other expenses. Contrary to the plaintiffs' arguments, the implementation of the IAS is based upon "hospital-specific" data. The category-specific inflation indices are individually applied to each hospital's own category-specific cost structure. Again, actual costs are taken into account. Volume adjustments are also made according to respective increases and decreases in volume of services in each particular hospital. Finally, other adjustments are made to reflect the individual hospital's pricing practices, changes in uncompensated care levels, and unusual or government-mandated costs. The completed rate order is offered to the individual hospitals, which have the option of a full rate review if they do not believe that the rate order under the IAS is appropriate. Since its inception, the large majority of hospitals have utilized the IAS as opposed to the full rate review without complaint. In fact, there had been 1000 rate adjustments from 1977 until the time this action was filed, but only 35 were formal rate reviews.

The record in this case indicates that the IAS works: it is administratively less burdensome for both the Commission and the regulated hospitals, and it has accomplished the goals set by the General Assembly. Between 1976 and 1992, Maryland hospital rates fell 36 percentage points in comparison to the national average. As mentioned in Part I, the IAS has been less successful in the years since 1992; however, the Commission has acted promptly and effectively with the addition of the SCF, and rates have always remained at or below

3% less than the national average. Although the IAS may be imperfect, specifically in its performance since 1992, its record over the past 22 years shows that the system does work. *See P.G. Doctors' Hosp. v. Health Serv. Cost Rev. Comm'n,* 302 Md. 193, 204, 486 A.2d 744, 749–750 (1985) (the Commission's use of the Guaranteed Inpatient Review (GIR) System was within the authority of the Commission despite the fact that the method had imperfections). With the implementation of the SCF, the record shows that the IAS is constantly being improved. *See P.G. Doctors' Hosp.,* 302 Md. at 209, 486 A.2d at 752 (the Commission's use of the "market basket" methodology was within the Commission's statutory authority despite the fact that the method had been altered over time). Simply because a methodology has been refined does not mean that it was initially defective. 302 Md. at 209, 486 A.2d at 752.

■ The Commission's authority to employ the IAS is reinforced by the General Assembly's acquiescence in the 22 years that the IAS has been utilized by the Commission. Section 19–212, which delineates the Commission's duties, has been amended four times since the IAS was first implemented in 1976, and § 19–219, which permits use of "alternate ratesetting methods," has been amended five times since 1976. In fact, in 1985, the General Assembly, added § 19–219(b)(3) which specifically allows the Commission "to take into account objective standards of efficiency and effectiveness" when "determining the reasonableness of rates." The General Assembly has had numerous opportunities to forbid the use of, or even limit the use of, the IAS, yet it has not done so. The Legislature has not reduced the Commission's authority and, with the addition of section 19–219(b)(3), has even expanded that authority. Finally, when the statutory provisions governing the Commission's authorizing statute were amended this year, after the present case was filed, the General Assembly failed to make any relevant changes to the statutory provisions at issue in this case. Since the IAS methodology has been utilized by the Commission for 22 years without any legislative change, there is "a strong presumption that the agency's interpretation [of the statute] is correct." *Falik v.*

*Prince George's Hosp.,* 322 Md. 409, 415–416, 588 A.2d 324, 327 (1991).

In addition to the statute's plain language and the Legislature's inaction over the past 22 years, the General Assembly has made one goal clear which provides further legislative justification for the use of the IAS. The Commission has been told repeatedly by the General Assembly to maintain the so-called "Medicare waiver," which is considered to be "the foundation of Maryland's hospital payment system." Ch.112 of the Acts of 1985, *Laws of Maryland* 1985 at 1544. *See* § 19–214(b)(5). Under Maryland's "all-payor" system, which was implemented in 1977, all payors of hospital care in Maryland generally pay the same Commission-set rates. This enables Maryland hospitals to provide care for the uninsured. In order for this system to be carried out, the federal Medicare program has waived application of its reimbursement rates in Maryland. Consequently Commission rates also apply to Medicare reimbursement. To keep this waiver, Maryland hospitals' aggregate rate of increase in costs per hospital inpatient admissions must not exceed the rate of increase for admissions with respect to all hospitals in the nation. *See* 42 U.S.C. § 1395(f)(b)(3)(B). Therefore, in order to maintain the Medicare waiver, the Commission must do a national rate comparison. Under the IAS, the national inflation rate in certain goods is applied in order to adjust rates from the previous year. In light of the Commission's mandate to keep rates below the national rate of increase, use of the national inflation rate is reasonable.

The Commission's authority to use the IAS is further supported by our prior opinions dealing with the Commission. In *Franklin Square I,* 277 Md. 93, 352 A.2d 798, we addressed the issue of whether or not the Commission was required to approve rates proposed by a hospital whenever those rates were reasonable. We answered that question in the negative, holding that the Legislature intended to give the Commission "broad authority over the financial affairs of hospitals." 277 Md. at 111, 352 A.2d at 809. Accordingly, we concluded that the Commission was "empowered to approve that rate struc-

ture which it finds to be most reasonable under the circumstances," and was not required "to defer to the hospital's view of reasonableness in cases of conflict." 277 Md. at 110, 113, 352 A.2d at 809, 810.

After *Franklin Square I* was remanded to the trial court and the judgment was modified, the case was again appealed to this Court in order to determine if the modified judgment was consistent with this Court's prior opinion. *Health Serv. Cost v. Franklin Sq.,* 280 Md. 233, 372 A.2d 1051 (1977) (*Franklin Square II*). In *Franklin Square II,* we held that the trial court's modified judgment was inconsistent with this Court's opinion in that it required the Commission to include certain cost factors in rate determination without a finding by the Commission that inclusion was appropriate in each particular case. 280 Md. at 241, 372 A.2d at 1055. This Court held that, in order for the Commission to exercise its broad authority to set reasonable rates, the Commission's setting of rates "must of necessity be determined on a case-by-case basis," and that "[a]bsolute rules concerning cost factors, applicable to all hospitals under all circumstances ... are ... inappropriate." 280 Md. at 241, 372 A.2d at 1055.

Contrary to the contentions of the plaintiffs, the Commission's implementation of the IAS is not inconsistent with this Court's decision in *Franklin Square II.* During the past 22 years in which the IAS has been in use, hospital rates in Maryland have been determined on a case-by-case basis. Although the national inflation rate is uniformly applied to all hospitals under the Commission's authority, the individual circumstances of each hospital have been taken into account annually, resulting in a wide range of hospital rate increases per year. For example, in 1996–97, the individual hospital rate changes ranged from –1.78% to +20.41%.

The wide range of rate changes is the result of the particularized findings of the Commission in the application of the IAS to each hospital. As discussed previously, the application of the national inflation rate varies from hospital to hospital because the rate is indexed and applied according to

the individual hospital's category-specific cost structure. For example, a hospital carrying a larger burden in salaries and fringe benefits compared to equipment would have the inflation rate applied differently than a hospital with elevated equipment costs and lower salary costs. In addition, according to the Commission's staff, the IAS takes into account the particular circumstances of individual hospitals in numerous ways:

> "Uncompensated care mark-ups are provided based on a hospital's actual values of characteristics that are statistically significant in explaining variations in uncompensated care. Adjustments for providing payer discounts are provided based on a hospital's actual payer mix. Price adjustments and penalties are based on a hospital's actual pricing practices. Volume adjustments are based on a hospital's actual variance from its budgeted volumes. Unusual cost adjustments are based on a hospital's actual cost of conforming to certain government mandates or any other irregular cost proposed by a hospital that is determined by the Commission to be eligible under this category of cost. * * * The GIR or TPR [Total Patient Review] reward is based on the hospital's actual improvement in treating patients on a per case or capitation basis." [4]

As a result of the particularized application of the IAS, rates are determined on a case-by-case basis, and as such, the IAS is not an "absolute" rule "applicable to all hospitals under all circumstances." *Franklin Square II,* 280 Md. at 241, 372 A.2d at 1055.

The IAS is similar to two other methodologies implemented by the Commission and reviewed by this Court in *P.G. Doctors' Hosp. v. Health Serv. Cost Rev. Comm'n, supra,* 302 Md. 193, 486 A.2d 744. The two methodologies at issue were the

---

[4]. According to the response by the Commission's staff to questions regarding the IAS at a Commission hearing, "[t]he GIR System rewards a hospital for becoming more efficient on a per case basis and penalizes a hospital for becoming less efficient on a per case basis. The TPR [Total Patient Review] System rewards a hospital for treating its patient population in a more efficient manner."

GIR System, which " 'establishes an approved rate for the total costs incurred for the treatment of a given patient's diagnosis regardless of the units of service rendered,' " and the market basket system which compares the costs of the hospital being reviewed to the costs of a group of hospitals (the "market basket") considered to be comparable to that hospital. *P.G. Doctors' Hosp.*, 302 Md. at 203, 207, 486 A.2d at 749, 751, quoting *Health Serv. Cost Rev. v. Lutheran Hosp.*, 298 Md. 651, 659–660 n. 5, 472 A.2d 55, 59 n. 5 (1984). In the *P.G. Doctors' Hosp.* case, the hospital alleged, *inter alia,* that use of the GIR System exceeded the Commission's statutory authority to "determine the reasonableness of costs," because it "regulate[d] the quality [and] quantity of services," and that the market basket methodology "was illegally used as an absolute rule." 302 Md. at 203, 207, 486 A.2d at 749, 751. This Court held that the GIR System and the market basket methodology were within the Commission's authority to "promote and approve alternate methods of rate determination and payment that are of an experimental nature," (§ 19–219(c); 302 Md. at 204, 208–210, 486 A.2d at 750, 751–753), and that the market basket methodology did not impose an absolute rule but was "simply a method of comparison." 302 Md. at 210, 486 A.2d at 753. As a result, we held that both methodologies were within the statutory authority of the Commission.

The IAS, like the GIR System and the market basket methodology, is an administratively efficient "alternate method of rate determination." *See* § 19–219(c). It is individualized, as actual costs are taken into account. Because of the Maryland regulatory scheme, which includes the IAS, Maryland is the only state to retain the Medicare waiver. For all these reasons, the use of the IAS is entirely within the statutory authority of the Commission.

## IV.

■ Next, the plaintiffs claim that the Commission has violated the statute by allowing excess revenue to fund community service programs. They argue that community service

programs are not within the definition of "hospital services" under § 19–201 and that, therefore, the Commission does not have the authority "to approve rates that fund activities other than hospital services." (Plaintiffs' brief at 23).[5] The plaintiffs argue that the Commission is obligated to account for excess revenue and to make sure that it is applied to reduce a hospital's future rates. They contend that, when a hospital has succeeded in performing more efficiently than required by the Commission, any excess revenue thus produced is to be used to benefit purchasers.

The Commission is required to assure purchasers of health care services that the "total costs of all hospital services … are reasonable," and that aggregate hospital rates are "related reasonably" to aggregate costs. § 19–212(5)(i), (ii); § 19–219(a)(1), (2). The plaintiffs argue that, because community services are financed "through the ratemaking process … rates are not reasonably related to the costs of hospital services." (Plaintiffs' brief at 24). The result, they contend, is a "hidden tax" levied on the purchasers "to support community programs unrelated to hospital services." *Ibid.*

The foundation of the petitioners' argument is flawed. The Commission does not take into account the cost of community service programs when it is setting rates for individual hospitals. Rates are set according to either the full rate review or the IAS, and at no time under either methodology is the cost of community service programs a factor taken into consideration. Through the implementation of the IAS, the Commission is fulfilling its statutory duty of determining reasonable rates, and it is also permitting the facilities within its jurisdic-

---

**5.** At the time this case was filed, "hospital services" were defined as: "(i) Inpatient hospital services as enumerated in Medicare Regulation 42 C.F.R. § 409.10, as amended; (ii) Emergency services; (iii) Outpatient services provided at the hospital; and (iv) Identified physician services for which a facility has Commission-approved rates on June 30, 1985.... 'Hospital services' does not include outpatient renal dialysis services." § 19–201(d). Chapter 678 of the Acts of 1999, effective October 1, 1999, added to § 19–201 language excluding "[o]utpatient services provided at a limited service hospital as defined in § 19–301 of this title, except for emergency services."

tion "to provide effective and efficient service that is in the public interest." § 19–220(d). The final rate order proposed by the Commission is intended to encourage hospitals to operate within their budget and to create their own excess revenues. This is evidenced by the Commission's two-fold purpose in the implementation of the IAS: first, to provide a less administratively difficult method of rate determination to replace the full rate reviews, and second, to provide incentives for the hospitals to perform more efficiently.

The General Assembly has not mandated that the Commission set rates that are absolutely equal to the costs of "hospital services." On the contrary, the Commission is to "[a]ssure each purchaser of health care facility services that . . . [t]he aggregate rates of the facility are related reasonably to the aggregate costs of the facility . . . ." § 19–212(5)(ii). *See also* § 19–219(a)(2). In addition, the Commission has a responsibility to "concern itself" with the fiscal integrity of the individual hospitals. § 19–212(4). *See Franklin Square I,* 277 Md. at 111, 352 A.2d at 809. The rates set by the Commission are a boundary within which the hospitals must operate. If a hospital fails to operate within the boundary, the Commission works out a "spend-down" agreement with the specific hospital. If the hospital succeeds in minimizing costs, however, the revenue thus produced is the property of the hospital. This excess revenue provides incentive for the individual hospitals to perform more efficiently. If the rates set by the Commission have been "reasonable," and if they have been "related reasonably" to costs in the aggregate, the Commission has fulfilled its statutory mandate. It is not required to place further limitations upon an efficient hospital.[6]

The General Assembly did not require that excess revenue be used to reduce hospital rates in the next year. Moreover, the Commission could reasonably conclude that using revenue for community service programs, including preventive public

---

6. According to the Commission, the average "positive margin" for regulated hospitals since the implementation of the IAS has ranged from 0.5% to 6%.

health, may, in fact, reduce future hospital costs. As the Commission points out, "[c]ommunity health programs provided by Maryland hospitals help reduce both present and future utilization, emergency room primary care, and case complexity." (Commission's brief at 27). Allowing hospitals to use excess revenue to serve their respective communities is consistent with the Commission's authority to consider the public interest. *See* § 19–220(d).

## V.

The plaintiffs' final argument is that the Commission violated Maryland's APA when it adopted the IAS by resolution, and began applying it to particular facilities, instead of promulgating it as regulation. They contend that the IAS fits within the APA definition of "regulation" and that, therefore, it must be adopted by formal APA rulemaking.

■ Under the APA, Code (1984, 1999 Repl.Vol. ), § 10–101(g)(1) of the State Government Article, the term "regulation" is defined as:

"[A] statement or an amendment or repeal of a statement that:

(i) has general application;

(ii) has future effect;

(iii) is adopted by a unit to:

1. detail or carry out a law that the unit administers;

2. govern organization of the unit;

3. govern the procedure of the unit; or

4. govern practice before the unit; and

(iv) is in any form, including:

1. a guideline;

2. a rule;

3. a standard;

4. a statement of interpretation; or

5. a statement of policy."

The plaintiffs argue that the IAS, "as a statement, standard and rule of Commission policy, with general application and

future effect ... is indisputably a regulation under the APA." (Plaintiffs' brief at 27). As this Court's opinions have made clear, however, whether an agency policy technically fits the APA definition of "regulation" is not the test for determining if the agency is required to proceed by formal rulemaking.

In *Balto. Gas & Elec. v. Public Serv. Comm'n*, 305 Md. 145, 168, 501 A.2d 1307, 1319 (1986), which also involved a challenge to agency standards and policies used in rate regulation, Chief Judge Murphy for the Court set forth the governing principle as follows:

"It is a well settled principle of administrative law that 'the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.' *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947)."

The Court in *Balto. Gas & Elec.*, 305 Md. at 167, 501 A.2d at 1318, also pointed out that, when setting or approving rates for a particular entity, the government regulatory agency "is required to articulate the standards through which it applied the applicable law to the relevant facts in reaching its decision" and that "such standards will often have a degree of general application and future effect." The Court continued, "[t]o conclude, however, that every time an agency explains the standards through which it applies a statute ... it is promulgating rules, ... would be patently unreasonable." *Ibid.* We concluded in *Balto. Gas & Elec.* that the agency had not abused its discretion by failing to promulgate its ratesetting standards through formal rulemaking, stating that "[t]his is not a case ... in which materially modified or new standards were applied retroactively to the detriment of a [regulated entity] that had relied upon the Commission's past pronouncements." 305 Md. at 169, 501 A.2d at 1319. *See also Consumer Protection v. Consumer Pub.*, 304 Md. 731, 754–755, 501 A.2d 48, 60–61 (1985), where we earlier pointed out that courts allow government regulatory agencies "broad discretion in choosing whether to develop policy by rulemaking" or through " 'case-by-case evolution of statutory standards.' "

(Quoting *SEC v. Chenery Corp., supra,* 332 U.S. at 203, 67 S.Ct. at 1580, 91 L.Ed. at 2002).

Another pertinent case is *Dept. of Health v. Chimes,* 343 Md. 336, 681 A.2d 484 (1996). In *Chimes,* the Developmental Disabilities Administration (DDA) of the Maryland Department of Health and Mental Hygiene had contracted with Chimes, Inc. to provide community-based residential programs for persons with developmental disabilities. In order to control costs, the DDA instituted the Prospective Payment System (PPS). Under the PPS, payments to providers like Chimes were based on two categories of costs or "cost centers." *Chimes,* 343 Md. at 341, 681 A.2d at 486. In 1994, the DDA applied a "growth cap," limiting growth in the second set of cost centers (administrative, general, capital, and transportation costs). Chimes filed a declaratory judgment action challenging the "growth cap" on the ground that the agency had violated the APA in failing to adopt the growth cap by formal rulemaking. The circuit court agreed with Chimes, declaring that the growth cap was invalid, but this Court reversed. Relying on the *Balto. Gas & Elec.* case and the *Consumer Pub.* case, we held that the DDA did not violate the APA by implementing the cap without formal rulemaking. The Court noted that the growth cap "did not formulate new rules of widespread application, change existing law, or apply new standards retroactively to the detriment of an entity that had relied on the agency's past pronouncements." *Chimes,* 343 Md. at 346, 681 A.2d at 489.

The case in this Court on which the plaintiffs primarily rely is *CBS v. Comptroller,* 319 Md. 687, 575 A.2d 324 (1990). *CBS* involved the method or formula used by the Comptroller of the Treasury for apportioning a part of CBS's taxable income to Maryland. Prior to 1980, CBS had computed its taxes according to a particular method which had been approved by the Comptroller. During an audit of CBS's tax return for the 1980–1981 tax year, however, the Comptroller insisted on changing the method. This Court held that the Comptroller was required to adopt the new method by rulemaking because it was a change in the Comptroller's generally applicable

policy and was being applied retroactively to the detriment of the taxpayer. The Court distinguished our prior cases as follows (*CBS*, 319 Md. at 699–700, 575 A.2d at 330):

"The effect of the Comptroller's audit was to announce a substantially new generally applicable policy with respect to apportionment of the network advertising income of national broadcasting corporations. That change, for practical purposes, amounted to a change in a generally applicable rule. Unlike the agency action in *Consumer Protection*, it *was* an effective 'change [in] existing law' and *did* 'formulate rules of widespread application.' 304 Md. at 756, 501 A.2d at 61. Unlike the agency action in *Baltimore Gas & Elec.* it *was* 'a case . . . in which materially modified or new standards were applied retroactively to the detriment of a company that had relied upon the [agency's] past pronouncements.' 305 Md. at 169, 501 A.2d at 1319. Under these circumstances, we hold that the new policy had to be promulgated pursuant to the rulemaking procedures of the APA."

The *CBS* decision furnishes no support for the plaintiffs' argument in the case at bar. The Commission's use of the IAS does not represent a change in the policies or standards applied by the Commission. It is not being applied retroactively to the detriment of the regulated hospitals. The IAS is simply a methodology, long in use, to effectuate the law. It reflects policies set forth by the General Assembly. It is a starting point from which the Commission proceeds case-by-case in order to take into account the individualized costs and needs of the particular hospitals. As such, formal rulemaking is not required as it was in *CBS*. Instead, the Commission's use of the IAS is much more like the use of agency policies or methods in the *Chimes, Balto. Gas & Elec.* and *Consumer Pub.* cases, where formal rulemaking was not required.

## VI.

Although we agree with the circuit court that this case should be resolved in favor of the defendants, we cannot affirm the judgment below.

The plaintiffs in this action sought a declaratory judgment, and the issues under counts 1, 3, and 4 were appropriate for a declaratory judgment. The circuit court, however, filed no written declaratory judgment and filed no written opinion which could be treated as a declaratory judgment. In this regard, the circuit court committed error.

In *Harford Mutual v. Woodfin,* 344 Md. 399, 414–415, 687 A.2d 652, 659 (1997), we recently explained the requirement of a written declaration in a case such as this:

"This Court has reiterated time after time that, when a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, 'the trial court must render a declaratory judgment.' *Christ v. Department,* 335 Md. 427, 435, 644 A.2d 34, 38 (1994). '[W]here a party requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral rulings and a grant of . . . judgment in favor of the prevailing party.' *Ashton v. Brown,* 339 Md. 70, 87, 660 A.2d 447, 455 (1995), and cases there cited.

"The fact that the side which requested the declaratory judgment did not prevail in the circuit court does not render a written declaration of the parties' rights unnecessary. As this Court stated many years ago, 'whether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the rights of the parties under the issues made.' *Case v. Comptroller,* 219 Md. 282, 288, 149 A.2d 6, 9 (1959). *See also, e.g., Christ v. Department, supra,* 335 Md. at 435–436, 644 A.2d at 38 ('[t]he court's rejection of the plaintiff's position on the merits furnishes no ground for' failure to file a declaratory judgment); *Broadwater v. State,* 303 Md. 461, 467, 494 A.2d 934, 937 (1985) ('the trial judge should have declared the rights of the parties even if such declaration might be contrary to the desires of the plaintiff'); *East v. Gilchrist,* 293 Md. 453, 461 n. 3, 445 A.2d 343, 347 n. 3 (1982) ('where a plaintiff seeks a declaratory judgment . . . , and the court's conclusion . . . is exactly opposite from the plaintiff's contention, nevertheless the court must, under the

plaintiff's prayer for relief, issue a declaratory judgment'); *Shapiro v. County Comm.*, 219 Md. 298, 302–303, 149 A.2d 396, 399 (1959) ('even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree')."

Upon remand, the circuit court shall "enter a new judgment which shall include a declaration of the rights of the parties ..." consistent with this opinion. *Robert T. Foley Co. v. W.S.S.C.*, 283 Md. 140, 155, 389 A.2d 350, 359 (1978).

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED, AND CASE REMANDED TO THAT COURT FOR THE ENTRY OF JUDGMENT IN ACCORDANCE WITH THIS OPINION. APPELLANTS TO PAY COSTS.*